315 So.2d 307 (1975)
STATE of Louisiana
v.
John J. BELL et al.
No. 55652.
Supreme Court of Louisiana.
March 31, 1975.
Rehearing Denied April 25, 1975.
Dissenting Opinion April 29, 1975.
*308 Murphy W. Bell, Director, R. Judge Eames, Baton Rouge, for defendants-appellants.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie Brown, Dist. Atty., Ralph L. Roy, Asst. Dist. Atty., for plaintiff-appellee.
DIXON, Justice.
On January 10, 1972, North Boulevard, a thoroughfare in downtown Baton Rouge, was blocked by cars parked across the street. When the police attempted to remove the cars and disperse "muslim" demonstrators blocking the street, violence ensued. Five men were killedtwo deputy sheriffs and three of the defendants' alleged co-conspirators; one reporter for a local television station was severely beaten some time before the "riot" and remains unconscious to this date. This outbreak of violence had significant effects upon the community which were the subject of extensive national and local publicity.
Defendants were indicted for having violated Acts 1969, No. 176[1] (R.S. 14:329.-1-329.8) by having incited and participated in a riot in which the death of a person occurred. A motion for change of venue was timely filed. After a hearing, this motion was denied and defendants applied to this court for the issuance of supervisory writs reversing the trial court's decision. This application was denied. Immediately prior to trial a supplemental motion for a change of venue was filed, heard and denied. After an extensive voir dire selection process, defendants were tried April 24-30, 1973, fifteen months after the incident. All the defendants were found guilty and sentenced under the penalty provisions of R.S. 14:329.7 to serve twenty-one years at hard labor.
*309 On appeal defendants urge ninety-nine of the one hundred eight bills of exceptions reserved at trial; these bills have been organized on appeal into sixteen arguments. We confine our discussion to the first argument dealing with the denial of defendants' first application for change of venue (Bills of Exceptions Nos. 1-10), finding reversible error.
A defendant is guaranteed an impartial jury and a fair trial. To accomplish this end the law provides for a change of venue when a defendant demonstrates his inability to obtain an impartial jury or fair trial at the place of original venue. Groppi v. Wisconsin, 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971);[2] Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1966);[3] Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).
The specific provision of Louisiana law providing for a change of venue is found in C.Cr.P. 622:
"A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
"In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial."
This article was adopted as part of the Code of Criminal Procedure in 1966. It changed the test used previously in this State to determine whether a change of venue was necessary. The former rules had been concisely stated in State v. Scott, 237 La. 71, 85, 110 So.2d 530, 535 (1959):
"The burden of establishing that an applicant cannot obtain a fair trial in the parish where the crime was committed rests with him. The test is whether there can be secured with reasonable certainty from the citizens of the parish a jury whose members will be able to try the case on the law and evidence, uninfluenced by what they may have heard of the matter and who will give the accused full benefit of any reasonable doubt arising either from the evidence or the lack of it. . . . The power to grant a change of venue rests in the sound discretion of the trial judge, whose ruling will not be disturbed in the absence of a showing of clear abuse thereof."
Because of the deficiencies in this judicial interpretation of the change of venue provisions (see Rideau v. Louisiana, supra), the legislature, in the 1966 article (C.Cr.P. 622), clearly intended that grounds for challenge for cause of jurors and grounds for a change of venue be separate and different concepts. The burden of *310 proof and discretion accorded the trial court was not changed. The expression of the legislative intent is contained in the Official Revision Comment to article 622:
"(a) Although all American jurisdictions contain change of venue statutes, the tests provided are in most cases not as strongly worded as in this article, which is taken in part from Art. 292 of the 1928 Louisiana Code of Criminal Procedure.
"(b) A careful search of all cases reported on the appellate level on the subject of change of venue in Louisiana did not reveal a single instance in which a new trial was granted on the ground that the lower court had improperly refused an application for a change of venue. This is not unique to Louisiana. See Bailey and Golding, Remedies for Prejudicial PublicityChange of Venue and Continuation in Federal Criminal Procedure, 18 Fed.B.J. 56 (1958). This results from the fact, no doubt, that the test for a change of venue, as interpreted by the jurisprudence, is much weaker than was intended by the express language used in former R.S. 15:292. In State v. Scott, 237 La. 71, 85, 110 So.2d 530, 535 (1959), the court stated the test to be as follows:
"The test is whether there can be secured with reasonable certainty from the citizens of the parish a jury whose members will be able to try the case on the law and the evidence, uninfluenced by what they may have heard of the matter and who will give the accused the full benefit of any reasonable doubt arising either from the evidence or the lack of it.'
"See also State v. Faciane, 233 La. 1028, 99 So.2d 333 (1958), and cases cited therein.
"The difficulty with the test in the Scott case is that it confuses the grounds for challenges for cause with grounds for change of venue. In effect the test is nothing more than valid grounds for challenges for cause. These leads to the conclusion that if the defendant cannot successfully challenge for cause he has no grounds for a change of venue; and furthermore, that if he does challenge for cause and the objectionable jurors are thus removed he has no grounds for change of venue. Logically, therefore, change of venue did not exist as a concept separate from challenge for cause. It may be noted, however, that other states having statutory language similar to that of Louisiana have also refused changes of venue, reasoning that it was possible ultimately to empanel a jury, each member of which was not subject individually to the charge of unfairness or partiality so as to subject them to a challenge for cause. See People v. Mendes, 35 Cal.2d 537, 219 P.2d 1 (1950); Powell v. State, 131 Fla. 254, 175 So. 213 (1937); People v. Sleezer, 9 Ill.2d 57, 136 N.E.2d 808 (1956).
"The foregoing suggests that the emasculated change of venue test as announced by the supreme court has no value. It is thus clear that the change of venue concept must be one which overrides the challenge for cause concept and is to be superimposed upon the entire proceeding. A change of venue ought to be available even though, individually, each juror is not susceptible to a valid challenge for cause, if the defendant can show that overriding all of these things and superimposed upon all of them he still cannot get a fair trial. The change of venue concept should operate where the state of the public mind against the defendant is such that jurors will not completely answer honestly upon their voir dire, or witnesses will be so affected by the public atmosphere that they will not testify freely and frankly.
"It is the purpose of the second paragraph of this article to effect such a policy and to overcome the jurisprudence in the cases cited above."
*311 Some relevant factors[4] in determining whether to change venue are (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. See, generally, Annotation, 33 A.L.R.3d 17 (1970).
Defendants filed applications for a change of venue on February 20, 1973 and supplemental applications on March 9 and March 26, 1973.[5] On February 26, 1973 a hearing was held on the defendants' first petition (February 20, 1973) in which they contended that the publicity surrounding defendants' alleged activities had so inflamed and prejudiced the citizens of East Baton Rouge Parish that it was impossible for them to secure an unbiased jury or a fair and impartial trial. They further alleged that government officials had commented publicly at the time of the riot that they were satisfied the defendants were guilty of the crime charged, should be severely punished and that the citizenry was ready and waiting should other black muslims come to Baton Rouge. Finally, they alleged that the district attorney had prepared a bill of information charging the defendants with the attempted murder of Bob Johnson, the television newsman who remained comatose, which he would file shortly prior to the selection of the jury to further gain publicity and prejudice the public mind.
After the motion for a change of venue was filed, the trial judge, in a conference in chambers, decided to summons three hundred prospective jurors drawn from the jury wheel to determine the attitudes of a cross section of the community. Defense counsel did not object, but informed the judge of his intention to produce additional evidence, such as pretrial publicity and other witnesses to show bias in the community. Defense counsel complied with the judge's request not to issue his subpoenas for the additional evidence until after the "dry run voir dire," which might, itself, result in an order for a change of venue.
*312 At the hearing held on the change of venue motion, sixty of the three hundred prospective jurors subpoenaed were called in panels of twenty each; three were not questioned, as they were excused for extraneous reasons. All those questioned had heard or read the publicity surrounding the riot and the subsequent events. Of the fifty-seven interviewed seventeen had formed an opinion which would prevent them from impartially judging the evidence. Twenty-one persons testified that they had formed an opinion but could set it aside and reach a verdict based solely on the evidence presented at trial. An equal number testified that they had not formed an opinion regarding the defendants' innocence or guilt. There was no testimony concerning the extent and nature of publicity nor the community's attitude toward the defendants. The questioning was directed solely at the issue of whether the person could serve as an impartial juror or would be subject to challenge for cause at the defendants' trial.[6] After the potential jurors had been questioned, the trial judge denied the application for a change of venue. He refused to issue defendants' requested subpoenas of news media representatives or permit the introduction of evidence of the extensive publicity, including film of interviews with public officials.[7]
*313 The record indicates that the trial court was concerned only with whether it was possible to draw veniremen who would testify on voir dire that they would give the defendants a fair trial, uninfluenced by what they had heard or had seen outside the court, giving the accused the full benefit of any reasonable doubt. The focus of the examination upon the individual veniremen, and upon their prejudices and attitudes, arose from the failure of the court and prosecutor to appreciate the concept of change of venue as provided for in article 622. The defendants were entitled to a change of venue if they could show, even though it would be possible to select a jury whose members were not subject to a challenge for cause, that there were influences in the community which would affect the answers of jurors on the voir dire, or the testimony of witnesses at the trial, or that, for any other reason, a fair and impartial trial could not be obtained in the parish. Defendants had a right to the opportunity to adduce evidence to show that racial and religious passions in the community (demonstrated in the "dry run" voir dire before us) would prevent a fair and impartial trial.
By its ruling the trial court prevented the introduction of evidence supporting this proposition and precluded a determination, as contemplated by our law, of the community's attitude toward the defendants. Defendants were prevented from attempting to satisfy their burden of proof. This incorrect application of the law is reversible error since it deprived defendants of their opportunity to show that *314 they could not obtain an impartial jury or fair trial in East Baton Rouge Parish.
For these reasons, the convictions and sentences are reversed, and the case is remanded to the district court for further proceedings consistent with the views expressed herein.
SANDERS, C. J., dissents and will assign written reasons.
SUMMER, J., dissents and will assign reasons.
MARCUS, J., dissents.
SANDERS, Chief Justice (dissenting).
This prosecution arises from a street disorder in Baton Rouge on January 10, 1972. During the violence, five men were killed, including two deputy sheriffs. The news media gave extensive publicity to the event.
On February 20, 1973, the defendants filed a motion for a change of venue, alleging that the publicity had so inflamed the public against defendants that "it will be impossible for . . . defendants to secure an unbiased jury . . . and a fair and impartial trial." After the filing of the motion, the trial judge held a prehearing conference with the District Attorney's staff and defense counsel to formulate procedures for the hearing of the motion. At this conference, the trial judge presented for consideration the plan that three hundred prospective jurors be summoned as witnesses on the motion for change of venue. As indicated by the trial judge at the later hearing, those summoned not only represented a cross-section of the citizenry, but also formed the jury pool from which the trial jurors would actually be drawn. This plan was agreeable to both the prosecution and defense. Defense counsel did suggest that he would offer additional evidence as to the nature and extent of the publicity.
The motion for change of venue came on for hearing on February 26, 1973. The hearing proceeded according to the agreed plan. After receiving the testimony of fifty-seven prospective jurors, the trial judge concluded from the testimony that the publicity surrounding the event had not so infected the public as to prevent the selection of an unbiased jury. He concluded that a fair trial could be had in East Baton Rouge Parish.
The transcript shows:
THE TRIAL JUDGE: ". . . we have gone through some 60 jurors, most of themwe had better than half of them called, at least 20 jury veniremen, who convinced the Court from their testimony that they could serve as jurors. Out of the last 20, we had 15 left who said they could serve. The basis of this motion is primarily aimed at making this determination, so I see no real reason for going through all those jurors that have been called here. I think we have gotten a fair cross section of the Parish and unless there is some argument you would like to make as far as those jurors being questioned, I would like to release these jurors."
DEFENSE COUNSEL: "That's fine with me, sir."
THE PROSECUTOR: "No objection."
The trial judge overruled the motion for a change of venue, but defense counsel suggested that he would later produce additional evidence as to the nature of the publicity for appellate review.
On the same day, on motion of defense counsel, the trial judge issued subpoenas duces tecum to the Baton Rouge newspapers and television stations ordering them to produce in court on March 1, 1973, all items referring to the street disorder. The subpoenas directed to the television stations read: "All film and comment used on the air since January 5, 1972, concerning the so-called `muslim incident' and/or related items."
*315 On March 1, 1973, a collection of the newspaper articles was admitted in evidence upon the stipulation of the District Attorney and defense counsel.
The television stations, however, appeared in response to the subpoenas and, through counsel, filed an objection to them on the ground they were too broad. Defense counsel pointed out that, in the absence of a designation of programs, the cost to the station in personnel, time, and money would be most burdensome. At this point, defense counsel attempted to orally modify the subpoenas. Counsel for the stations, however, asserted that, even accepting the oral modification, the subpoenas would require the detailed editing of all television presentations for "something less than ... 14 months."
Counsel for the stations stated:
". . . without more specific knowledge, it would certainly be difficult, if not impossible, to comply, insofar as any specific selection is concerned, and frankly, this is a matter of principle. We feel we must object to, in effect, doing the research for a litigant, be it the Public Defender, or the prosecution, or even a civil litigant."
Defense counsel stated that the information was necessary in order to attach it to the bill of exceptions reserved to the overruling of the motion for a change of venue.
The trial judge quashed the subpoenas.
Eight days later, the defendant made application to this Court for writs, assigning as errors the overruling of the motion to change venue and rendition of a ruling by the trial judge before the documentary evidence of publicity was admitted in evidence. The application contained a description of the publicity from the various news media. Attached to the application was a collection of the newspaper articles. This Court denied the writ with the following Per Curiam: "The showing made is insufficient to warrant the exercise of our supervisory jurisdiction." See State v. Bell, La., 274 So.2d 392 (1973).
On March 26, 1973, the defendants filed a supplemental motion for a change of venue. This motion was heard on March 30. At this hearing, defense counsel presented the testimony of various officials, including the Mayor of Baton Rouge, law enforcement officers, representatives of the news media, and other witnesses. The defense also introduced fourteen items of documentary evidence. At the conclusion of the hearing, with the benefit of all the evidence presented to the court at previous times, the trial judge again overruled the motion for a change of venue.
The initial question is whether the trial judge erred in quashing the subpoenas duces tecum directed to the Baton Rouge television stations on March 1, 1973. I think not.
Article 732 of the Louisiana Code of Criminal Procedure requires that a subpoena duces tecum contain a reasonably accurate description of the material sought. It also authorizes the judge to vacate a subpoena if it is unreasonable or oppressive. The oral modification by defense counsel was ineffective, since subpoenas duces tecum are court orders. See LSA-C.Cr.P. Arts. 731, 732, 733. Assuming, however, that the oral modification was effective, the subpoenas were still unreasonable and oppressive. To require television stations to edit all their programs for a period of "something less than ... 14 months," at a substantial cost to themselves in money and staff time is unconscionable. At least, the subpoenas should designate the dates and types of programs, the films of which are to be produced. Moreover, the nature of the publicity was largely conceded by the State or disclosed at the two hearings on the motion to change venue. The trial judge, of course, took it into account in his rulings.
The final question, arising from the majority opinion, is whether the trial judge *316 had an adequate evidentiary basis for his ruling denying the change of venue.
A trial judge, of course, has the discretion to determine when adequate evidence has been received on a contested issue to be decided by him. See LSA-C.Cr.P. Art. 17. His judgment should not be distrubed as to the adequacy of the basic evidence, absent a clear showing of abuse of discretion.
I am firmly convinced that the trial judge had adequate evidence from which to form his judgment.
The evidence at the first hearing, consisting of the testimony of fifty-seven witnesses, was extensive. As the trial judge noted, those who testified represented a fair cross section of the community. At the hearing, it was conceded by the State and recognized by the trial judge that the publicity surrounding the incident had been extensive. The interrogation is replete with reference to the publicity.
After that hearing, the defense introduced documentary evidence of the publicity.
At the second hearing on the supplemental motion to change venue, twelve witnesses, including public officials, law enforcement officers, and representatives of the news media, testified. The defendants also introduced additional documentary evidence.
Thus, in reaching his decision on the motion to change venue, the trial judge had the benefit of the testimony of sixty-nine witnesses and scores of documents. In ruling at the second hearing, the trial judge stated that he would "reconsider" the change of venue at the time of trial, if any new developments occurred. This summary demonstrates, I think, that the trial judge had an adequate basis for his ruling.
The time element is of special significance here. Both change-of-venue hearings were held over a year after the tragic episode. The trial, itself, was held fifteen months after the incident. The time interval was such that the emotions surrounding the incident had receded. An actual film of the riot was a major item of proof. Taking into account the entire record, I am of the opinion that the defendants not only could receive a fair trial in Baton Rouge but did receive one.
For the reasons assigned, I respectfully dissent.
SUMMERS, Justice (dissenting).
I dissent for the reasons assigned by the Chief Justice.

On Application for Rehearing
PER CURIAM.
In the majority opinion we reversed because the rulings of the trial judge, on motion for change of venue, prohibited and prevented defendants from producing witnesses and evidence to show the nature and extent of the pretrial publicity and its effect upon the community attitude toward defendants; defendants were not permitted to call witnesses and adduce evidence on the motion for change of venue to prove their contention that there were influences in the community which would affect answers of jurors on voir dire, or the testimony of witnesses at the trial, making it impossible to obtain a fair and impartial trial.
The dissenting opinion finds: that subpoenas were issued at defendants' request; that there was "adequate evidence" (of the nature of the pretrial publicity) on the first motion for change of venue on which the trial judge could have based his judgment; and, in any event, there was a second hearing on a motion to change venue at which defendants introduced documentary evidence of publicity, and at which testimony was adduced from public officials, law enforcement officials and representatives of the news media.
*317 The interpretation of the record by the majority and by the dissenting opinion are so contradictory that both cannot be accurate. This conflict has prompted a reexamination.
The dissenting opinion initially discusses the conference held prior to the first hearing of defendants' motion for a change of venue. The dissent states, "This plan was agreeable to both the prosecution and defense. Defense counsel did suggest that he would offer additional evidence as to the nature and extent of the publicity." This statement of defense counsel's position is not correct Defense counsel had agreed to the proposal by the court that three hundred veniremen be called; there was a clear understanding that the defense would be permitted to introduce evidence concerning pretrial publicity if the trial court did not agree, after the examination of the veniremen that there should be a change of venue. Therefore, defense counsel at the request of the trial court delayed issuing subpoenas for additional witnesses until after the "dry run voir dire" of the veniremen. The defense position, which has not been controverted by the State in the record or brief, was clearly stated to the court following the conclusion of the questioning of the veniremen. The record is clear:
"THE COURT: ... we have gone through some 60 jurors. Most of them we had better than half of them called, at least 20 jury veniremen, who convinced the Court from their testimony that they could serve as jurors. Out of the last 20, we had 15 left who said they could serve. The basis of this motion is primarily aimed at making this determination, so I see no real reason for going through all those jurors that have been called here. I think we have gotten a fair cross section of the Parish and unless there is some argument you would like to make as far as those jurors being questioned, I would like to release these jurors.
"MR. HEBERT: That's fine with me, sir.
"THE COURT: Mr. Roy?
"MR. ROY: No objection.
"THE COURT: All right, gentlemen, the Court wants to thank you for coming and I want to congratulate Mr. Alello for getting so many of you here today. You may go by the Clerk's Office and you will be paid for coming up here today, and you are now finally discharged, and we may see most of you back here in March.
"MR. HEBERT: I have some subpoenas to introduce into evidence, some evidence as to the amount of publicity which this case received . . .
"THE COURT: I think you probably could stipulate . . .
"MR. HEBERT: I'm not going to stipulate. . .
"MR. ROY: I think all of the jurorsall of the witnesses said so, that they had all heard about it and seen it. I think the record will support that, Judge.
"MR. HEBERT: I'm not willing to stipulate.
"MR. ROY: Well, okay, we are just trying to be . . .
"THE COURT: Well, I am going to, at this time, overrule the motion for change of venue.
"MR. HEBERT: Without issuing these subpoenas, after you told me, in your office. . .
"THE COURT: Well, if we had run into any difficulty, that this publicity was causing bias or prejudice, I would have let you put it in for the purpose of showing to the Supreme Court on the bill that you will likely take on the motion for change of venue, the actual publicity it received, but based on the fact that these jurors who have testified here this morningI think almost all of them saw itand most of them did not feel that this would render them so opinionated or prejudiced that they could not serve as a juror, and I feel *318 that it would add nothing to the record to put it in.
"MR. HEBERT: Your Honor, I would like to put a statement in the record. I'll take the oath, if you want me to, but when I filed this motion and it was set down for hearing, I told you I was going to issue subpoenas . . .
"THE COURT: You can issue your subpoenas. If you want to go ahead and issue your subpoenas, issue them. The question is whether or not I'm going to change my mind on the question of change of venue, and I have already ruled.
"MR. HEBERT: Well, the purpose of issuing these subpoenasI know that you know, you were here and you saw itbut the higher Courts didn't, and I would like this in evidence, so . . .
"THE COURT: You can object to my ruling and offer them and attach it to your bill of exception.
"MR. HEBERT: Well, I want to either make a statement or take the witness stand, in connection with . . .
"THE COURT: I will agree that you and I talked about it, about issuing the subpoenas, and in my opinion, we do not need it, but if you want to make that a bill of exception to my ruling, you may put in the record the subpoenas and ask that they be attached to your bill of exception.
"MR. HEBERT: And they will be so attached?
"THE COURT: If you ask for them to be attached, and you can get them, I have no objection to your going to the Supreme Court.
"MR. HEBERT: All right, I want tofirst of all, I want to make an argument.
"THE COURT: I don't need any argument. You can put that in your brief.
"MR. HEBERT: Well, the Supreme Court requires that we make it to the Court . . .
"THE COURT: Make it very brief.
"MR. HEBERT: Yes, sir, Article 622, Second Paragraph, Code of Civil [Criminal] Procedure, says, `In deciding whether to grant a change of venue, the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire''affect the answers of the jurors.' I think that if I am allowed to subpoena the various persons in the news media to show what publicity went on, that I could establish that there has been so much publicity and prejudice that it would have affected the answers of these jurors on voir dire, and some of the people who said they had an opinion, but could set it aside, were not, in fact, telling the truth, and I think that I am entitled to put into the record, and the Court should view this before reaching a decision, but since the Court has overruled my objection, I would like to reserve a bill of exception. I want to ask the Court . . .
"THE COURT: I have denied the change of venue. What you should do is take your bill to the denial of the change of venue and ask that the record be attached.
"MR. HEBERT: Well, Your Honor, I would like to make two objections, if you please. First of all, I am objecting to the Court's ruling without considering all of the evidence, and to that I am reserving a bill of exception and I would like to attach thereto the Court's statement that you had agreed that if you were disinclined to grant the change of venue, that you would allow me to issue these subpoenas and produce this evidence, and on denying the motion for change of venue, I want to object and reserve a bill of exception and I would like to attach thereto the entire transcript of these proceedings had here today, the application for change of venue, the evidence which will be adduced on this from these subpoenas which I presume the Court will signthe objections of counsel, the argument of counsel, and the ruling of the Court.
*319 "THE COURT: All right.
"MR. HEBERT: At this time, the defendants would like to give notice of intent to apply for supervisory writs and ask that the Court fix a time for the signing of the bills and the filing ofthe lodging of the record in the Supreme Court." (Emphasis added).
Defense counsel did not "suggest" that he would offer additional evidence concerning the publicity, but insisted and asserted at every opportunity his right to present such evidence and have it considered by the trial court. This right was unmistakably foreclosed when the trial court stated:
"You can issue your subpoenas. If you want to go ahead and issue your subpoenas, issue them. The question is whether or not I'm going to change my mind on the question of change of venue, and I have already ruled."
Finally, for the dissenting opinion to imply that defense counsel did not object to the conclusions of the trial court is incorrect. Defense counsel agreed to the release of the remaining veniremen who had been called. As is evident from the record, defense counsel immediately thereafter asserted his right to offer evidence of the publicity for consideration by the trial court. This was denied and the change of venue was denied on February 26.
The dissent states that subpoenas to the news media were issued on February 26 for the production of news articles and film on March 1, 1973. These subpoenas were not issued until after the trial judge had denied the motion for change of venue.
Defense counsel repeatedly objected to the court's ruling on the motion to change venue without considering all the evidence. Only persistence by defense counsel finally persuaded the trial judge that the evidence called for by the subpoenas (newspaper articles and film) was needed to attach to the bills of exceptions for presentation to this court on application for writs and for appeal.
The subpoenas were served on February 27, and on February 28 those named in the subpoenas obtained an order for a rule to show cause why they should not be vacated or modified.
On March 1 the rule to modify or vacate the subpoenas was heard. The record does not reflect, contrary to the statement in the dissenting opinion, any stipulation that newspaper articles were admitted in evidence. There was only a stipulation that the copies of the newspaper clippings appeared in the newspapers on the date written on them. When the State agreed, defense counsel announced that those clippings satisfied his subpoena to the newspapers, and the attorney for the papers and the editors thereupon withdrew their motions to modify or vacate.
The newspaper clippings were not "admitted in evidence" and were not considered by the trial judge in ruling on the motion for a change of venue.
Defense counsel offered to narrow his request for the film to four particular segments which had been identified to him by television personnel. Without any inquiry from counsel for the television group, the trial judge ruled that the defense was not entitled to the production of the evidence, and vacated the subpoenas.
The following excerpt from the record shows the argument and the ruling of the trial court:
"THE COURT: I would like to ask Mr. Hebert the purpose of this information he is seeking by these subpoenas.
"MR. HEBERT: The purpose of the information is to attach to the bill of exception to show . . .
"THE COURT: Which bill of exception?
"MR. HEBERT: The bill of exception to the overruling of the motion for change of venue, to show the higher Court, which may *320 not have been aware of what news has gone on, as this Court was, what news actually went out over the air and in the press. Now, I contacted the peoplefirst of all, I told the people at Channel 33 that in view of the fact that they weren't on the air at the time, that there was really nothing they could give me. I contacted Fred Brooks and talked to him in his office and he told me that he had three rolls of film, which had been turned over to the F. B. I. and they had returned copies to him, so I don'tI saw them sitting in his office and he showed me the scripts of the programs in his desk, and I said, that's all I want. I don't want us to have to do any going through all the films they may have somewhere that is not indexed. This is all I want. I went over to WAFB and talked to Carlton Cremeens and Carlton told me that they had a year-end show in which they had used some pieces of the Muslim film and that they had some other film involving interviews withor parts of interviews with some of the local and state officials, so I told them that all I really was interested in, if he could produce that film of the year-end show, and I don't know if I said the film was that week, but it is my intent to narrow it down to producing the film that was shown on the air immediately after the incident, which should be easily accessible by date.
"THE COURT: Well, let me say this, Mr. Hebert. The ultimate question is whether or not the defendants can receive a fair trial. It does not involve the amount of publicity and so forth that happened on the date of this alleged incident. It concerns whether or not, and I talked about it and satisfied myself if I did not satisfy defendant, after questioning some 60 jurors drawn from the jury venire, that they had been exposed to the publicity but that they didn't know any of the defendants and could give the defendants a fair trial, any opinion they had could be set aside and they would abide by the rules of Court concerning presumption of innocence, burden of proof and determine guilt or innocence, based upon the evidence. I do not think it makes a particle of difference concerning how much publicity occurred at that time. I was living here at the time in fact, I was presiding in this Courtroom when it happened. I saw the news and I could not identify one of those defendants, and I don't thinkin the first place, I don't think you have a right to appeal at this time from my ruling on the change of venue. If you do, if the Supreme Court decides to grant you such a right, I think your remedy is by appeal, should the defendants lose the case, and you will be able to show that some of the jurors who presidedwho served as jurors at the trial, were prejudiced and you could not challenge them, because you ran out of peremptory challenges and so forth, but I do not think you have a right to this, and the Court is not going to order these news media to produce this evidence.
"MR. HEBERT: Your Honor, could I interject a little argument on one of the legal points that you raised?
"THE COURT: All right.
"MR. HEBERT: The defendant disagreed with the Court's statement of law, that the issue of whether or not the defendants can get a fair trial is based uponsolely upon the answers of those jurors, and I am basing this argument on the Rideau case.
"THE COURT: The Rideau case had nothing in the world to do with this, Mr. Hebert. I tried the Rideau case here in Baton Rouge. The Rideau case involved a question of a defendant who was brought on television by the Sheriff, where he confessed to the crime . . .
"MR. HEBERT: Yes, sir.
"THE COURT: That did not occur in East Baton Rouge Parish . . .
"MR. HEBERT: No, sir.
"THE COURT: And I do not believe that the same rule applies.
*321 "MR. HEBERT: I was thinking an analogy not just to the volume of news, but there were statements made by leading Parish officials, the Mayor of East Baton Rouge Parish, the Chief of Police . . .
"THE COURT: If your argument is correct, then there is no place in the United States we could have tried Oswald for killing the President or Jack Ruby for killing Oswald. I don't believe that this is true. I think that these people can be tried here as much as I would like to see it transferredbut I am not going to order these people to produce this evidence, unless they voluntarily do so. In the first place, I do not believe that the Supreme Court can grant you any relief at this time. It may be that following the trial or during the trial, if you want some of this evidence to be shown, if so, you can try to offer it in this respect, but I don't believe that you are entitled to this type of evidence . . .
"MR. HEBERT: Even as I have orally narrowed down . . .
"THE COURT: You can object to my ruling, and you can put that in your writ, and if the Supreme Court orders me to do so, then I will order the persons subpoenaed to produce that evidence on the subpoenas duces tecum.
"MR. HEBERT: All right, I would like to object to the ruling of the Court. I would like for the record to reflect that from the statements of Mr. Middleton and myself, I had narrowed down the subpoena orally in statements to the news director of WAFB, WBRZ, and also Mr. Phil Oakley, and I would like to have the argument of both counsel here this morning, the ruling of the Court, the objection of counsel, made a part of the bill of exception. I would also like to attach these newspaper articles to this bill, as well as the bill on overruling the motion for change of venue." (Emphasis added).
Finally, the dissent discusses defendants' supplemental motion for a change of venue filed on March 26, 1973.
The motion of March 26 asked for a continuance and again requested a change of venue, but for reasons entirely different from those advanced in the motion tried and denied on February 26. Excluding the allegations concerning the request for continuance, the motion follows:
"MOVERS now allege that they have been severely prejudiced by the recent actions of the State and local officials in preparing for their trial in the following respects:
"a. Elaborate and ostentatious modifications have been constructed in and around the Parish Courthouse and Municipal Building.
"b. Extra public funds have been authorized and are being expended to purportedly `secure' all public buildings regardless of whether that building will be directly connected with the trial of movers.
"c. Law enforcement personnel are out in extra force patrolling the roofs of the Courthouse and adjacent Municipal Building with shotguns and other large and plainly visible weapons. (See attached photograph 1-)
"d. Metal detectors are set-up at the entrances to both the Parish Courthouse and the Municipal Building, and all persons are required to be searched electronically and physically before they are allowed to enter either building regardless of whether they are employed, visiting or connected with the impending trial of your movers.
"e. Fire and emergency drills are being conducted at intervals, and for the first time in the many, many years.
"f. All persons entering the Courthouse on March 26, 1973 will be issued `passes' in order to conduct any business in any portion of the Courthouse, whether or not it is related to movers' trial.
"g. All stairways have been cordoned off with plywood and chicken wire, where presumably armed guards will control the entrances.
*322 "h. Heavy metal and bullet proof glass barriers have been constructed in the Courtroom to seal off counsel and accused along with the Court and supportive personnel from the spectator area.
"i. Other wooden barriers have been constructed on the 3rd. floor of the Parish Courthouse opposite the Courtroom in which movers are scheduled to be tried.
"j. All prospective jurors, visitors and other persons are required to be screened at least twice before admittance is permitted in the Courtroom.
"MOVERS now allege and aver that the above over-elaborate and ostentatious `security procedures' authorized and instituted by State and Parish Officials are unnecessary and have been instituted for the primary purpose of creating an `atmosphere of fear and tension' among persons required to enter the Courthouse for purposes related to trial of movers. The effect of the institution of the elaborate `security procedures' will be to deny your movers right to a trial free of fear, tensions and apprehension among prospective jurors, (a list of which is attached hereto), spectators and other persons connected with the trial.
"MOVERS further allege and assert that they have all been `model prisoners' while incarcerated in the East Baton Rouge Parish Prison. Although there have been prisoner's riots and other serious disturbances during the fifteen months they have been waiting for trial in the parish prison, none of these defendants have been involved in a single incident. All of the defendants are from other parts of these United States and have no known connection with any organization which may cause trouble during the trial, therefore the state and parish officials have no rational purpose in constructing and carrying out such `security procedures' except to severely prejudice movers at their trial by making it appear that they are such `dangerous persons' as to make said precautions necessary and to `justify' and bring about their certain conviction.
"MOVERS now show that all of the prospective jurors subpoenaed for jury service on March 26, 1973 have been affected by the so-called security procedures presently in effect at the Courthouse. Mover further allege that none of these prospective jurors will be able to give movers a fair trial because of the installation and operation of these security procedures.
"MOVER further allege that all of the prospective jurors have been prejudiced against the accused herein because of the `Bob Johnson's case.' It is common knowledge among East Baton Rouge Citizens that Bob Johnson, popular TV newscaster was seriously injured January 10, 1972 while covering the `Muslim incident.' On March 6, 1973, Mr. Ossie Brown called a news conference and announced that he had `solved' the Bob Johnson's case but stated he did not want to give any details because `it might prejudice the case set for March 26, 1973'. (See attached copy for news story). Further, it is a well known fact that Mr. Brown intends to file Bills of Information against all movers herein charging the attempted murder of Bob Johnson because movers, by mistake, received said copies when they appeared for arraignment on the charges herein. Further, numerous benefits for support of Mr. Johnson have been a constant thing throughout the year. Citizens of Baton Rouge, both black and white have outpoured a great deal of sympathy for the popular TV newscaster who has lain comatose for nearly fifteen months. On yesterday, March 25, 1973, a Bob Johnson Benefit Rodeo was staged on False River by a group of public-spirited Baton Rouge Citizens (Attached is copy of hand bill widely circulated in Baton Rouge). Movers allege that because of the allegations contained herein they can not obtain a fair trial at this time in East Baton Rouge WHEREFORE MOVER PRAYS: . . ."
*323 The motion speaks for itself.
The testimony at the hearing held on March 26, 1973 concerned the need for the security measures as testified to by the Mayor of Baton Rouge and law enforcement officers. At the hearing there was additional testimony concerning defendants' motion for a continuance in order to have additional time in which to solicit women to register for jury duty. The actual witnesses at the hearing on March 26 and a summary of the subject matter of their testimony follows:
Mayor W. W. Dumas: necessity for security measures at courthouse; identifies two resolutions of parish governing authority authorizing expenditure of funds for security.
Mary Metz: activities of local chapter of National Organization for Women in recruiting women to register for jury duty.
Carl Crane (jailer): activities of defendants while in jail; no disruption by them.
Julius Hardy: identifies photographs of courthouse security measures taken by him for Public Defender's Office.
Woodson T. Callihan, Jr.: identifies handouts concerning Bob Johnson benefit fishing rodeo.
Annie Smart: discusses activities of Welfare Rights Organization in recruiting women to register for jury duty.
Bernadine McMath: discusses her activities as wife of one of the defendants in recruiting women to register for jury duty.
Perry M. Johnson, Sr.: discusses number of women who have registered for jury duty.
Ronald X. Crawford: testifies that at arraignment on February 15, 1973 he was handed bill of information by Ossie Brown, District Attorney, charging him with attempted murder of Robert Johnson. Bill was given to defense counsel who returned it to Mr. Brown. Defense counsel argues that statement of Mr. Brown at this news conference of March 6 that he had solved the Bob Johnson case but would not charge the perpetrators so as not to prejudice the defendants implied that defendants were the guilty parties.
William Bankston: as employee of State-Times, he testifies to certain articles being published in Morning Advocate and State-Times concerning the Bob Johnson rodeo and women jurors.
George W. Baker: testifies to his activities concerning recruitment of women for jury duty.
Theodore J. Newman: as second in command of state police security force, he testifies concerning the security measures in force at courthouse.
The fourteen items of documentary evidence introduced at the hearing, which are referred to by the dissent, consisted of two newspaper articles (on the registration of women for jury duty and on the Bob Johnson benefit bass tournament), ten pictures of the courthouse security measures for trial, two handouts on the Bob Johnson fishing rodeo, a copy of registration form for jury duty, and copies of the resolution passed by the city and parish councils authorizing the expenditure of funds for security at the trial.
Nothing was introduced pertaining to the publicity on which defendants' original motion for a change of venue had been based. Nothing in the supplemental motion for change of venue or in the evidence adduced thereon in any way affects the issues or conclusions of the majority opinion.
The sole issue in this case is whether the trial court erred on the hearing on defendants' original motion for a change of venue, which alleged that the extensive pretrial publicity would prevent defendants from obtaining an impartial jury and fair *324 trial, as conceived and guaranteed by C. Cr.P. 622 and the State and Federal Constitutions. The dissenting opinion states in this regard to support its conclusion that the trial court correctly applied the law:
"The evidence at the first hearing, consisting of the testimony of fifty-seven witnesses, was extensive. As the trial judge noted, those who testified represented a fair cross section of the community. At the hearing, it was conceded by the State and recognized by the trial judge that the publicity surrounding the incident had been extensive. The interrogation is replete with reference to the publicity."
A reading of the entire testimony of the fifty-seven veniremen at the February 26, 1973 hearing reveals that the hearing was concerned with only three questions: (1) had the veniremen heard of the incident either through television or newspaper; (2) had they formed an opinion concerning the guilt or innocence of the defendants; and (3) if so, would they be able to put this opinion aside and judge the defendants solely on the evidence presented at trial. There was no mention of the nature and extent of the publicity, beyond the fact that all fifty-seven veniremen questioned stated they had read or heard about the incident. This fact was stated by the majority opinion.
There was no evidence of any of the factors discussed in the majority opinion on which a decision to change venue should be determined. For example, there was no reference to whether the publicity was accusatory or inflammatory in nature. To say that the interrogation was "replete with reference to the publicity" is to leave an inaccurate impression of the content of the record. The transcript of that hearing contains no evidence from which the trial court could decide "whether the prejudice, the influence, or the other reasons [were] such that they [would] affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial." C.Cr.P. 622.
The second hearing on a change of venue on March 26, 1973 was irrelevant to the majority opinion and its conclusions. The change of venue based upon publicity surrounding the incident had been denied. The record had been completed, writs applied for and denied by this court on March 20, six days before the supplemental motion had been filed.
Defendants at the March 26, 1973 hearing were asserting new grounds for a change, that is, the allegedly unwarranted security measures which implied that defendants were dangerous and guilty men. They did not reassert the grounds for their previous original motion, as that issue had been decided adversely and was a closed issue until the appeal.
The trial judge did not have, as the dissent states, "the benefit of the testimony of sixty-nine witnesses and scores of documents" in reaching his decision. Rather, he based his decision solely upon the testimony of fifty-seven veniremen summonsed to see if it was possible to select a jury, the "scores of documents" were either subpoenaed after the trial court's decision, for the purpose of being attached to defendants' application for supervisory writs, or were concerned with matters totally unrelated to the defendants' allegations in their original motion for a change of venue.
The dissenting opinion attaches special significance to the time element, pointing out that the hearing on the change of venue was held a year after the incident and the trial fifteen months after the incident. The dissent states, "The time interval was such that the emotions surrounding the incident had receded." There is no evidence in the record to substantiate this conclusion. Rather, the few pieces of evidence concerning the Bob Johnson benefit bass tournament (scheduled for March 25, 1973) and the elaborate security measures taken by the parish indicate the contrary. *325 Furthermore, it would seem unjustifiable to suggest without evidence in the record, from an incident which left five men dead, two of whom were sheriff's deputies, and left a newscaster permanently unconscious, and caused the imposition of a curfew, the closure of schools and the use of National Guard troops, that passions in the community had subsided because of the passage of time, alone. However, as the majority opinion states, that is not at issue, as the trial court effectively prevented the defendants from exercising their right under C.Cr.P. 622 when it refused to consider the effect of publicity on the community. There is nothing in the record to support the conclusion of the dissenting opinion that the trial court correctly applied the law designed to insure defendants an impartial jury and a fair trial.
The legal questions presented on a motion for change of venue are stated in C. Cr.P. 622. A change of venue shall be granted when a fair and impartial trial cannot be obtained "by reason of prejudice existing in the public mind or because of undue influence." In determining prejudice or undue influence, the court shall consider whether "they will affect the answers of jurors on voir dire examination or the testimony of witnesses at the trial."
The defendants were not permitted to present evidence to discover the answers to these questions.
SANDERS, C. J., dissents from this Per Curiam and is of the opinion that a rehearing should be granted.
SUMMERS, J., dissents and assigns reasons.
MARCUS, J., dissents from this Per Curiam opinion and is of the opinion that a rehearing should be granted.
SUMMERS, Justice (dissenting).
After calling sixty prospective jurors, 57 of whom were questioned extensively concerning the effect the news would have upon their partiality in the trial of the case, the trial judge was satisfied that these witnesses were familiar with the news concerning the case, and he was further satisfied that they were able to render an impartial verdict on the evidence presented in the courtroom.
Defense counsel then sought to subpoena witnesses to "introduce evidence as to the amount of publicity which this case received." He acknowledged at that time that the trial judge was familiar with the news coverage the case had received because he was there, but the higher courts were not, and the evidence he sought to introduce would permit those courts to judge the case. At this urging of defense counsel, the trial court advised him to attach the evidence to his bill of exceptions for review by the appellate courts.
Accordingly, 276 news articles and 59 pictures, a total of 335 items clipped from the Baton Rouge newspapers, the State Times and Morning Advocate, are in this record. In addition, a complete motion picture film of the happening on the day of the killing is also in this record, this being to a large extent, the medium from which the television coverage was drawn.
Stating that it was unnecessary for him to review the nature or the extent of the media coverage of the case, the trial judge denied the motion for change of venue because he was familiar with the news having read it as it was released. He ruled, also, that he would not order the production of all film pertaining to the case, for to do so, in his opinion, was an unreasonable and burdensome obligation to impose on the television stations. He did say, however, that defendants could enter into the record whatever they could obtain voluntarily. When this ruling was made, defense counsel reserved a bill of exceptions in which it is recited that "the Court ordered that the transcript of the hearing, argument of counsel, the ruling of the Court, and the physical evidence *326 subpoenaed from the news media be attached." (emphasis added). There is no question, therefore, from the bill of exceptions prepared by defense counsel, that the evidence he sought to have introduced was, and is, included in the record.
Based upon the record thus established, defense counsel applied to this Court for review under its supervisory jurisdiction. The application contained the bill of exceptions and the attachments, including 108 news items and 26 picturesclippings concerning the case from the Baton Rouge State Times and Morning Advocate.
After review of this record by a full Court on the change of venue issue, we refused to grant writs on March 20, 1974. Reasons assigned declared that the showing was "insufficient to warrant the exercise of our supervisory jurisdiction." Only one member of the Court did not subscribe to this ruling. This should have ended the change of venue issue.
However, on March 26, 1973 defendants filed a supplemental application for change of venue and for a continuance. Although this supplemental motion is not relied upon by the Court's majority for the reversal, I shall mention that the ground alleged for the continuance was that no effort was being made to include women on the jury and the trial should be delayed until this could be accomplished. Defendants were of the opinion that the failure to include women deprived them of constitutional rights. This issue, of course, is unrelated to the change of venue motion before us.
The basis for the change of venue alleged in this supplemental motion was that prejudice resulted to defendants from the unnecessary and extraordinary security measures being undertaken by officials in preparation for the forthcoming trial of these defendants. Another allegation charged that prejudice resulted to them by public utterances of the District Attorney concerning the Bob Johnson case, in which the popular television newscaster was seriously injured while covering the incident upon which this prosecution is based. None of these issues are relied upon by the majority for the reversal it has decreed.
After an extensive hearing on this supplemental motion, change of venue was again denied. This appeal was taken to the conviction and sentence which resulted from the trial which followed.
Nowhere in the majority opinion is the voluminous evidence concerning the testimony of 57 prospective jurors considered, and nowhere are the many newspaper articles, photographs or film taken into account. The entire basis for reversal of this protracted and involved trial is the fact that the trial judge did not consider the newspaper publicity and film as a basis for his ruling denying a change of venue.
The trial judge did not, as the majority states, refuse to "permit the introduction of evidence of the extensive publicity, including film of interviews with public officials." To the contrary, as defense counsel's own bill of exceptions makes clear, the trial judge "ordered that the. . . physical evidence subpoenaed from the news media be attached." More importantly, the evidence is in the record; it is before us, and it has not been considered by this Court. Sole reliance has been placed on the trial judge's ruling that he would not consider the publicity evidence in his ruling because he was already familiar with the news.
Even if we consider this statement of the trial judge to be erroneous, if the evidence is in the record, as it is, this Court should review that evidence to determine whether an adequate evidentiary basis exists for the ruling of the trial judge. If such a basis is in the record, the ruling should be upheld whether the trial judge read it or not. If there is no basis in the record for his ruling, it should be reversed. This Court has not performed its proper *327 function until it has undertaken this appellate review.
The granting of a change of venue is to be exercised with caution. Such a decision rests within the sound discretion of the trial judge, whose ruling denying the motion will not be disturbed, unless the ruling is palpably erroneous and results in a clear abuse of judicial discretion. In Louisiana the Constitution in effect at the time of this trial directs that all trials shall take place in the parish in which the offense was committed, unless venue is changed. La.Const. art. I, ¶ 9 (1921). Change of venue, therefore, is an exception to the general rule of established procedure. In criminal cases the constitution authorizes change of venue. La. Const. art. VII, ¶ 45 (1921). The legislation implementing these provisions provides for a change of venue when "a fair and impartial trial cannot be obtained in the parish where the prosecution is pending." La.Code Crim.Proc. art. 622.
From this authority it is plain to see that a fair trial is the ultimate objective of the law. Thus, if it be assumed that the ruling of the trial judge was erroneous, if the accused nevertheless received a fair trial, the conviction and sentence should not be reversed on appeal. La.Code of Crim.Proc. art. 921. But the majority has not concerned itself with a review of that question. Instead, the trial has been reversed on a very technical and shallow consideration of a ruling on the admissibility of evidence at a hearing on a motion for change of venuea ruling which has had no effect whatever, for the evidence was in fact admitted into the record.
The testimony of the great majority of the prospective jurors to the effect that they had formed no opinion which would not yield to the evidence in court; their testimony that they had been exposed to the television, newspaper and radio publicity attending the case and the trial judge's exposure to the same publicity surely established the most important elements of the fair trial requirement on a change of venue issue. Yet, if this were not sufficient, this Court's majority of four should have considered the entire record of the hearing on the motion for a change of venue to determine whether the publicity was such that witnesses would be unduly influenced. The 276 news articles and 59 pictures would, with the testimony of the 57 prospective jurors and the time lapse of more than one year since the alleged offense, supply the answer. In failing to review all the evidence the majority has committed the fault it attributes to the trial judge.
I am convinced also that another factor in this record very probably influenced the trial judge in this ruling. Thirty-six pretrial motions were filed in this case. No doubt this led the trial judge to believe, to some extent at least, that these motions for change of venue were dilatory in characteran entirely proper attitude under the circumstances. United States v. Mesarosh, 13 F.R.D. 180 (W.D.Pa.1952).
Another practical consideration undoubtedly influencing the trial judge's ruling arises from the fact that the State Times and Morning Advocate are newspapers with state-wide circulation. Television news, like radio news, is also disseminated on a state-wide basis. Nothing could be gained by a shift to another parish under these circumstances. It would be unrealistic to say that the people of Orleans Parish, to which the removal was sought, had not read the same news or had not seen and heard the stories on television and radio to which the people of East Baton Rouge Parish had been exposed. United States v. Dioguardi, 20 F.R.D. 33 (S.D.N.Y.1956).
Strangely enough, and as alarming as it should be, this decision places this majority in the unenviable position of being the first Court to reverse a denial of a motion for change of venue in Louisiana, except in one case where the United States Supreme Court ordered such a result. See *328 State v. Rideau, 246 La. 451, 165 So.2d 282 (1964), and 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663. The Courts' judgments have not been one-sided over the years. Changes of venue by trial judges have been approved on appeal just as rulings refusing changes of venue have been. But the Courts' decisions have heretofore been characterized by the caution demanded in such cases, and by a deference to the trial judge's ruling which wisdom requires. His view of the matter as a member of the community has always until now been accorded great weight.
A fair trial is an essential of justice and one of the great guarantees of American government. So, too, is the punishment of those responsible for grave or heinous crimes a requisite to ordered liberty. These considerations have provided the safeguards and remedies which are hallmarks of our system of law. These same considerations require that these safeguards and remedies be utilized with caution. In my view this majority has failed in that respect.
I would grant a rehearing.
NOTES
[1] R.S. 14:329.1-3, 329.7 provide:

"A. A riot is a public disturbance involving an assemblage of three or more persons acting together or in concert which by tumultuous and violent conduct, or the imminent threat of tumultuous and violent conduct, results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property."
"Inciting to riot is the endeavor by any person to incite or procure any other person to create or participate in a riot."
"Any law enforcement or peace officer or public official responsible for keeping the peace may issue a command to disperse under the authority of R.S. 14:329.1-14:329.8 if he reasonably believes that riot is occurring or about to occur. The command to disperse shall be given in a manner reasonably calculated to be communicated to the assemblage.
"Whoever willfully fails to comply with a lawful command to disperse shall be punished in accordance with the provisions of R.S. 14:329.7."
"A. Whoever willfully is the offender or participates in a riot, or is guilty of inciting a riot, or who fails to comply with a lawful command to disperse, or who is guilty of wrongful use of public property, or violates any other provision hereof shall be fined not more than five hundred dollars or be imprisoned not more than six months, or both.
"B. Where as a result of any willful violation of the provisions of R.S. 14:329.1-14:329.8 there is any serious bodily injury or any property damage in excess of five thousand dollars, such offender shall be imprisoned at hard labor for not more than five years.
"C. Where, as a result of any willful violation of the provisions of R.S. 14:329.1-14:329.8, the death of any person occurs, such offender shall be imprisoned at hard labor for not to exceed twenty-one years."
[2] In Groppi, a Wisconsin statute was construed by the Wisconsin Supreme Court as prohibiting a change of venue in misdemeanor trials. In holding that the statute as construed and applied was unconstitutional, Justice Stewart, speaking for the court, stated:

"It is doubtless true, as the Supreme Court of Wisconsin said, that community prejudice is not often aroused against a man accused only of a misdemeanor. But under the Constitution a defendant must be given an opportunity to show that a change of venue is required in his case. The Wisconsin statute wholly denied that opportunity to the appellant." 400 U.S. at 511, 91 S.Ct. at 494.
[3] In a concurring opinion in Chapman, Justice Stewart states:

". . . To try a defendant in a community that has been exposed to publicity highly adverse to the defendant is per se ground for reversal of his conviction; no showing need be made that the jurors were in fact prejudiced against him." 386 U.S. at 43-44, 87 S.Ct. at 837.
[4] The following cases applying article 622 demonstrate the variety of factors considered by trial judges and this court in taking evidence on motions to change venue: State v. LaGarde, 308 So.2d 748, La.1975; State v. Flood, 301 So.2d 637 (La.1974); State v. Leichman, 286 So.2d 649 (La.1973); State v. Richmond, 284 So.2d 317 (La.1973); State v. Richmond, 278 So.2d 17 (La.1973); State v. Foy, 278 So.2d 38 (La.1973); State v. Green, 275 So.2d 184 (La.1973); State v. Didier, 273 So.2d 277 (La.1973); State v. Square, 257 La. 743, 244 So.2d 200 (1971), vacated in part, 408 U.S. 938, 92 S.Ct. 2871, 33 L.Ed.2d 760, conformed to, 263 La. 291, 268 So.2d 229; State v. Washington, 256 La. 233, 236 So.2d 23 (1970); State v. Poland, 255 La. 746, 232 So.2d 499 (1970), vacated in part, 408 U.S. 936, 92 S.Ct. 2862, 33 L.Ed. 2d 754, conformed to, 263 La. 269, 268 So.2d 221.

After the review of the evidence presented by the defendant in each of the above cited cases, it was found that the defendant failed to prove that he could not obtain a fair trial or impartial jury in the parish where the trial was pending. In addition to considering the answers of prospective jurors on voir dire, the trial judges in the above cases considered other factors which would affect the answers of the jurors or the testimony of witnesses at trial. For example, in State v. Leichman, supra, the fact that a crowd of fifty to one hundred gathered the night of the murders at the courthouse forcing the movement of defendant to an adjoining parish's jail was a relevant factor.
[5] The application filed on March 9, 1973 contained substantially the same allegations as the petition filed on February 20, 1973 and was passed without date on March 16, 1973. The supplemental application was heard on March 26, 1973 and concerned allegations concerning the effect of security measures and the "Bob Johnson Rodeo," and it is not at issue.
[6] Throughout the questioning of the potential jurors, both the district attorney and trial court asked whether the formed opinon of the person would "yield to the evidence." This provision of former R.S. 15:351(1) was specifically rejected by the legislature when it adopted article 797 in 1966. The present provision requires that the court be satisfied that despite his opinion or impression, the juror can render an impartial verdict according to the law and the evidence which includes the presumption of innocence. The "yield to the evidence" test was rejected, as it required the defendant to present evidence to rebut possible opinions of guilt thus negating his right to be presumed innocent.
[7] The colloquy during which defense counsel was denied the right to adduce evidence in support of his motion follows:

"THE COURT: All right, gentlemen, the Court wants to thank you for coming and I want to congratulate Mr. Alello for getting so many of you here today. You may go by the Clerk's office and you will be paid for coming up here today, and you are now finally discharged, and we may see most of you back here in March.
"MR. HEBERT: I have some subpoenas to introduce into evidence, some evidence as to the amount of publicity which this case received. . .
"THE COURT: I think you probably could stipulate. . .
"MR. HEBERT: I'm not going to stipulate. . .
"MR. ROY: I think all of the jurorsall of the witnesses said so, that they had all heard about it and seen it. I think the record will support that, Judge.
"MR. HEBERT: I'm not willing to stipulate.
"MR. ROY: Well, okay, we are just trying to be . . .
"THE COURT: Well, I am going to, at this time, overrule the motion for change of venue.
"MR. HEBERT: Without issuing these subpoenas, after you told me, in your office. . .
"THE COURT: Well, if we had run into any difficulty, that this publicity was causing bias or prejudice, I would have let you put it in for the purpose of showing to the Supreme Court on the bill that you will likely take on the motion for change of venue, the actual publicity it received, but based on the fact that these jurors who have testified here this morningI think almost all of them saw it and most of them did not feel that this would render them so opiniontated or prejudiced that they could not serve as a juror, and I feel that it would add nothing to the record to put it in.
"MR. HEBERT: Your Honor, I would like to put a statement in the record. I'll take the oath, if you want me to, but when I filed this motion and it was set down for hearing, I told you I was going to issue subponeas. . .
"THE COURT: You can issue your subpoenas. If you want to go ahead and issue your subpoenas, issue them. The question is whether or not I'm going to change my mind on the question of change of venue, and I have already ruled.
"MR. HEBERT: Well, the purpose of issuing these subpoenasI know that you know, you were here and you saw itbut the higher Courts didn't, and I would like this in evidence, so . . .
"THE COURT: You can object to my ruling and offer them and attach it to your bill of exception.
"MR. HEBERT: Well, I want to either make a statement or take the witness stand, in connection with . . .
"THE COURT: I will agree that you and I talked about it, about issuing the subpoenas, and in my opinion, we do not need it, but if you want to make that a bill of exception to my ruling, you may put in the record the subpoenas and ask that they be attached to your bill of exception.
"MR. HEBERT: And they will be so attached?
"THE COURT: If you ask for them to be attached, and you can get them, I have no objection to your going to the Supreme Court.
"MR. HEBERT: All right, I want to first of all, I want to make an argument.
"THE COURT: I don't need any argument. You can put that in your brief.
"MR. HEBERT: Well, the Supreme Court requires that we make it to the Court . . .
"THE COURT: Make it very brief.
"MR. HEBERT: Yes, sir, Article 622, Second Paragraph, Code of Civil Procedure, says, `In deciding whether to grant a change of venue, the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire''affect the answers of the jurors.' I think that if I am allowed to subpoena the various persons in the news media to show what publicity went on, that I could establish that there has been so much publicity and prejudice that it would have affected the answers of these jurors on voir dire, and some of the people who said they had an opinion, but could set it aside, were not, in fact, telling the truth, and I think that I am entitled to put into the record, and the Court should view this before reaching a decision, but since the Court has overruled my objection, I would like to reserve a bill of exception. I want to ask the Court. . .
"THE COURT: I have denied the change of venue. What you should do is take your bill to the denial of the change of venue and ask that the record be attached.
"MR. HEBERT: Well, Your Honor, I would like to make two objections, if you please. First of all, I am objecting to the Court's ruling without considering all of the evidence, and to that I am reserving a bill of exception and I would like to attach thereto the Court's statement that you had agreed that if you were disinclined to grant the change of venue, that you would allow me to issue these subpoenas and produce this evidence, and on denying the motion for change of venue, I want to object and reserve a bill of exception and I would like to attach thereto the entire transcript of these proceedings had here today, the application for change of venue, the evidence which will be adduced on thisfrom these subpoenas which I presume the Court will signthe objections of counsel, the argument of counsel, and the ruling of the Court.
"THE COURT: All right.
"MR. HEBERT: At this time, the defendants would like to give notice of intent to apply for supervisory writs and ask that the Court fix a time for the signing of the bills and the filing ofthe lodging of the record in the Supreme Court."