404 So.2d 889 (1981)
STATE of Louisiana
v.
Florence Yvonne McDONALD.
No. 80-KA-2684.
Supreme Court of Louisiana.
September 8, 1981.
Rehearing Denied October 16, 1981.
*890 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Paul Carmouche, Dist. Atty., Dale G. Cox, Asst. Dist. Atty., for plaintiff-appellee.
Richard V. Burns, Alexandria, for defendant-appellant.
KLIEBERT, Justice Ad Hoc.[1]
Defendant Florence McDonald was indicted by a Caddo Parish Grand Jury on November 15, 1978 for being a principal to possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (14.24).
Facts adduced at the trial were: Wayne Robert Felde, defendant's brother, was convicted in Maryland in 1972. His conviction was reversed on appeal and in 1975 he plead guilty to manslaughter and four counts of assault. He was sentenced to twelve years' imprisonment. The following year he escaped while participating in a work release program and returned to Louisiana. On October 10, 1978, Florence McDonald and Felde went to Lorant's Sporting Goods Store in Shreveport where Felde purchased a .357 magnum pistol and shells. McDonald wrote a check for fifty dollars. The state sought to prove that McDonald knew her brother was purchasing a gun and wrote the check in partial payment of the purchase price. The defense contended that McDonald knew nothing of the purchase and was simply repaying a debt she owed her brother.
The defendant was found guilty as charged and sentenced to five years at hard labor. She appealed, urging seventeen assignments of error.[2]
The more strenuously urged assignments of error are those relative to the trial judge's denying motions for a change of venue and a continuance based upon pretrial publicity. On the same day the gun was purchased, the defendant's brother, Wayne Robert Felde, was arrested and while in custody shot and killed a Shreveport police officer with the gun.
Defense counsel urged that as a result of the pretrial publicity, such a prejudice existed in the public mind that defendant McDonald could not receive a fair and impartial trial in Caddo Parish. In support of this contention, defendant pointed to the gravity of the offense of the slaying of a police officer, the crime her brother is accused of, the impact the offense had on the community, the publicity given to the case of Wayne Robert Felde and the link provided by the press between Wayne Robert Felde and his sister and contends this resulted in the prejudice existing in the community against Wayne Robert Felde being accrued against the defendant denying her a fair trial
*891 Grounds for a motion for a change of venue are provided by La. C.Cr.P. Art. 622. To be entitled to a change of venue under this article, defendant must prove more than a mere knowledge by the public of facts surrounding the offense. Defendant's burden is to show there is such a prejudice in the collective mind of the community that a fair trial is impossible. State v. Matthews, 354 So.2d 552 (La.1978); State v. Baldwin, 388 So.2d 679 (La.1980); State v. Adams, 394 So.2d 1204 (La.1981). A number of factors must be considered in determining whether to change venue. This Court stated in State v. Bell, 315 So.2d 307, 311 (La.):
"Some relevant factors in determining whether to change venue are (1) the nature of the pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of the time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire."
On the original hearing of the motion for a change of venue the trial court took evidence in the form of facts agreed to by the defense and the prosecution which included newspaper articles appearing in newspapers published in Shreveport and listened to television and radio newscast tapes broadcast in the Shreveport area.[3] In a written opinion *892 the trial judge concluded all accounts of the incidents in question were factual in their content and were presented in an objective, non-inflammatory manner and denied the original motion for change of venue.
Immediately prior to the trial, the defense supplemented its motion for a change of venue. At this hearing the trial court admitted additional newspaper articles and in a supplemental opinion stated these articles were "pretty much self-induced or self-generated by the defense" by the type of motions the defense had filed. At the conclusion of this hearing the court informed the defense it would allow the defense to re-urge the motion for a change of venue. Prior to impaneling the jury the trial court went through a "dry run" voir dire examination of 12 prospective jurors.
During the dry run voir dire, some jurors stated they were aware of defendant McDonald's case and her brother's from the media coverage as well as other sources. Most jurors indicated that despite this awareness they would accept the trial court's instructions and decide the case on the evidence presented at trial. Others had no knowledge of the case, or only a vague knowledge. One juror indicated a strong opinion against defendant McDonald based on what he had seen and heard. Most prospective jurors had at least some knowledge of the case.
After the "dry run", the judge again denied the motion for change of venue as well as a motion for continuance. After hearing the prospective jurors respond to questions, the judge noted that despite widespread publicity and the fact that the jury venire had some knowledge of both the Felde and McDonald cases, the court felt the challenges for cause and the peremptory challenges could be properly exercised to insure the proper selection of a jury which could give McDonald a fair trial.
Applying the factors enumerated in Bell, supra, quoted above, we find the trial judge did not make an error or abuse his discretion in denying the motion for a change of venue in this case. Considering each element specified in the Bell case, supra, in the light of the entire record here, we believe the defendant's right to a fair and impartial trial was not violated.
As to the first factor (i.e., the nature of pretrial publicity and the degree to which it was circulated in the community), enumerated in Bell, the trial court concluded and we agree that the media produced only factual accounts of the incidents and were not inflammatory.
The second factor listed in Bell, supra, is the connection of government officials with the release of publicity. There is no indication that the state contributed to the dissemination of publicity, other than police reports apparently released to the press which the trial judge ascertained were both accurate and factual. Additionally, the District Attorney's office took precautions in insulating the defendant's trial from the publicity, i.e., 1) the state moved jointly with the defendant to sequester each juror as they were sworn, even though this is not a capital case and such measures are not required by law; 2) the state did not oppose the defendant's motion to close the pretrial proceedings to the press or public;[4] 3) the state participated in a "dry run" voir dire examination of jurors to determine the impact of the publicity on the community. Thus, the state did not contribute in any significant way to the publicity connected with this case.
The third Bell factor to be considered is the length of time between the dissemination of publicity and the trial. McDonald was arrested on October 24, 1978 and her trial took place September 11-18 of 1979. Fifty-one articles appeared in the papers from the date of the slaying of the police *893 officer (October 20, 1978) until and including the change of venue hearing on September 9, 1979. Most of the publicity, however, concerned Wayne Robert Felde, the defendant's brother.
The defense asserted that all the publicity in the Felde case automatically affected defendant McDonald's case because of their brother-sister relationship and the defendant's connection with the purchase of the murder weapon. The trial judge disagreed and noted that the existence of publicity alone is insufficient to mandate a change of venue. The burden of proof is on the defendant to show there existed such prejudice in the collective mind of the community that a fair trial was impossible. In the "dry run" voir dire examinations more prospective jurors had knowledge of Wayne Robert Felde than of Florence McDonald and only one had definite feelings against the defendant, Florence McDonald. The trial judge concluded the defense could use and the record reveals it did use its challenges for cause and its peremptory challenges to insure a proper jury selection in Caddo Parish.
The fourth consideration is the severity and notoriety of the offense. The offense of which McDonald was charged, i. e., being a principal to a convicted felon in possession of a firearm was serious in that it carried the possibility of a 10 year prison sentence. The notoriety of the offense resulted from the connection with her brother's slaying of a rookie police officer and his arrest for first degree murder, the bulk of which had occurred ten months prior to this trial. The vast majority of the publicity occurring immediately prior to the trial was defense generated publicity growing out of the motions filed by the defendant. The trial court held that although the publicity was created it did not prevent her from obtaining a fair and impartial trial.
With regard to the fifth factor enumerated in Bell, supra, the facts stipulated to by the state and the defense reveal that the jury would be drawn from the registered voters of Caddo Parish. Of 98,000 registered voters, 83,000 lived in Shreveport, the city where the crime occurred. Thus, there was a large base from which to select a jury.
Regarding the sixth factor (other events occurring in the community which either affected or reflected the attitude of the community) it appears that prior to October, 1978, a police officer had not been slain in Caddo Parish in ten years. Two more officers were slain soon thereafter, totalling three slain officers within a span of a year.
In the earlier articles, references were made to these slayings and no doubt contributed to some extent to the publicity involving the defendant's brother. There was little connexity between the defendant and this publicity.
The fifth factor of Bell dealt with the candor and veracity of the prospective jurors on the voir dire. Following the "dry run" voir dire, the trial judge concluded the prospective jurors' examination during the "dry run" were candid in expressing their views and would yield to the evidence and law as presented during the trial. After reviewing the record on the dry run voir dire and the examination of the prospective jurors during the empanelling of the jury, we believe the prospective jurors were candid in expressing their views and those selected for the jury did yield to the evidence and the law presented to them with fairness and impartiality.
Subsequent to conviction of the defendant in the trial court, this Court in State v. Felde, 382 So.2d 1384 (La.), on a writ application, vacated a trial court order denying a change of venue for the defendant's brother, Wayne Robert Felde. In summarizing the basis of this decision, this Court said:
"... we determine the necessity for the change of venue to be predicated upon the following particular and unique facts of this case: the voluminous pre-trial publicity surrounding the defendant's trial; the cumulative effects of publicity surrounding the trials of subsequent defendants involving the shooting of police officers and the trial of the defendant's sister who was implicated in the present case which may have caused a connexity *894 in the public's mind on the innocence of defendant; and in the interest of judicial economy. We therefore find that under the particular facts of this case, the defendant has made a sufficient showing of a strong likelihood that prejudice may exist in the public mind. In the interest of judicial economy, we direct the district court to order a change of venue for defendant's trial." (Emphasis in original.)
In the Felde case the early publicity was relative to Felde's alleged shooting of the police officer with little or no connexity in the publicity between Felde and the defendant in this case. Subsequent to the conviction of the defendant here, there occurred extreme publicity relative to this conviction and its connexity with the innocence of defendant Felde. This coupled with the fact the bulk of the publicity we are concerned with in this case concerned the defendant Felde and not the defendant McDonald distinguishes this case from the Felde.
Whether the defendant in this case made the requisite showing that a fair and impartial trial could not be obtained in Shreveport is a question addressed to the trial court's sound discretion and in the absence of an affirmative showing of error or abuse of discretion should not be disturbed on review. State v. Sonnier, 379 So.2d 1336 (La.1979); State v. Matthews, 354 So.2d 552 (La.1978) and State v. Sheppard, 350 So.2d 615 (La.1977). We find no affirmative showing of error or abuse of discretion in the trial court's denial of the motion for change of venue. Further, considering the entire record here (including the dry run voir dire and the voir dire during the empanelling of the jury and the newspaper articles, television clips and radio clips submitted in evidence), we believe the prospective jurors were candid in their voir dire examinations and did apply the evidence and the law in a fair and impartial manner.
The defendant also assigns as error the trial judge's denial of closed hearing of the pretrial hearings on the motion to quash, discovery motions and motions for change of venue. The defense urged necessity of closed hearings to insulate the defendant from additional publicity. The state made no opposition to the defense motions.
In the trial court and here the defense cites Gannett Company, Inc. v. Despasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1978) in support of its contentions. The trial court denied the motion, reasoning that this factual situation was distinguishable from Gannett where the motions dealt with the suppression of a statement or the exclusion of evidence, the underlying basis for the decision being to avoid tainting the prospective jury venire with knowledge of potentially inadmissible or illegally obtained evidence. The court then ruled that "the 6th and 14th amendments rights are (sic) at this particular juncture would override that of the defendant to waive her right to a closed hearing."
In State v. Kent, 391 So.2d 429 at 433 (La.1980), the Court noted: "Although the U. S. Supreme Court recognized in Gannett (citation omitted) that the trial court may permit a defendant to waive his Sixth Amendment right to a public proceeding, there is no indication that there is a concomitant right to a closed proceeding."[5] In the case of Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the Supreme Court found the right to attend criminal trials to be implicit in the guarantees of the First Amendment. The Court's reasoning left open the possibility that a criminal proceeding might be closed to the public, but only where the trial court's findings supported a *895 determination that the accused rights to a fair trial would be prejudiced and where alternative solutions were not adequate to ensure protection of the defendant's rights.
The defendant, however, has made no showing of how she was prejudicially affected by the denial of the request for closed hearings, other than asserting the hearings may have generated additional publicity. As noted by the state, it was actually unclear whether opposition to or support of the motion would generate more publicity, as simply filing the motion was newsworthy enough for the papers. Absent some more specific showing of how denial of the closed hearings prejudiced defendant, i.e., what if any information or publicity was produced which proved damaging to defendant, we find no abuse of the trial court's discretion in denying the closed hearings.
As further error the defendant urged that the trial court erred in failing to comply with the sentencing guidelines set forth in La.C.Cr.P. Art. 894.1 and by imposing an excessive sentence. La.R.S. 14:95 and R.S. 14:24 provide that the punishment for the crime in question is imprisonment at hard labor for not less than three and not more than ten years. Defendant McDonald was sentenced to five years at hard labor with credit given for time served.
This Court has held that imposition of a sentence even within statutory limits may violate defendant's right under the Louisiana Constitution against excessive punishment. Thus, it has been determined that excessiveness of sentence poses a question of law reviewable under the appellate jurisdiction of this Court. State v. Sepulvado, 367 So.2d 762 (La.1979). Sepulvado further states that adequate review mandates that the trial judge state specific reasons for an apparently severe sentence in relation to the particular offender and the actual offense. While the trial judge need not articulate every aggravating and mitigating circumstance presented in Art. 894.1, the record must reflect that it actually considered these guidelines in particularizing the sentence to the defendant. State v. Vaughn, 378 So.2d 905 (La.1979); State v. Franks, 373 So.2d 1307 (La.1979).
As a general rule, a sentence is excessive "... if it is grossly out of proportion to the severity of the crime, or if it is nothing more than the purposes and needless imposition of pain and suffering." State v. Bonanno, 384 So.2d 355, 357 (La.1980).
In sentencing defendant McDonald to five years, the trial judge referred to information contained in the presentence investigation report. The defense acknowledged receipt of the PSI and sought to clarify two issues contained therein.
First, the PSI alleged that Ms. McDonald had in some way assisted her brother in escaping from prison in Maryland. Counsel for the defendant called to the stand the detective who allegedly made the assertion to the probation officer compiling the pre-sentence investigation. Detective Owens testified that he had not positively stated that the defendant played any part in Wayne Robert Felde's escape and that in fact he had nothing to substantiate that claim other than the fact that during the time of Felde's escape, McDonald took some time off of work and shortly thereafter Wayne Robert Felde appeared in Louisiana. It was asserted by the defense that McDonald and her husband had travelled to Tennessee during that period of time.
Secondly, counsel for the defendant also addressed information in the PSI which suggested an incident of embezzlement by the defendant during past employment. The attorney for the company in question testified that his client had not accused the defendant of embezzlement. Though there had been a problem with a check written and endorsed by McDonald over five years ago, the witness stated that McDonald had been a trusted employee of the company for several years prior to that incident and the circumstances surrounding the check were unclear.
After clarifying these issues, defense counsel urged the imposition of the minimum sentence and reminded the court that the defendant had two small children at home.
*896 In articulating his reasons for sentencing in compliance with Art. 894.1, the trial judge noted that McDonald had no prior history of delinquency or criminal activity and that her imprisonment would create a hardship for her family. He felt, however, that McDonald would not respond affirmatively to probation. In support of this, he noted statements made by McDonald that she had no regrets and that her brother had gotten a "bum rap" in Maryland. It was also noted that she exhibited no remorse for the fact that her brother had taken a human life. The judge stressed that McDonald knew her brother was an escapee from Maryland and that he was being sought by authorities. The judge felt it was reasonable for the defendant to know that if she assisted Wayne Robert Felde in purchasing a weapon he would use it to avoid apprehension. The court concluded that defendant McDonald was provoked by a strong love for her brother and under similar circumstances her conduct was likely to be repeated.
In conclusion, the judge conceded that imprisonment would impose a severe hardship upon the defendant personally and especially upon her young children. Nevertheless, he felt a lesser sentence would deprecate the severity of the offense and imposed a sentence of five years at hard labor.
A review of the record reveals a careful consideration of the guidelines of Art. 894.1. Therefore, if there is any problem with defendant's sentence it is one of excessiveness and not failure to state specific reasons for the sentence.
A trial court is afforded wide discretion in the imposition of sentences within the statutory limits and such sentence will not be set aside as excessive in the absence of manifest abuse of discretion. State v. Forshee, 395 So.2d 742 (La.1981). The fact that this is defendant's first offense and that she has two small children at home can be considered important mitigating factors here. However, the sentence is well within the statutorily provided range and it cannot be said to be an abuse of the trial court's discretion.
For the foregoing reasons, therefore, the conviction and sentence of the defendant are affirmed.
REDMANN, J. Pro Tem., dissents with reasons.
REDMANN, Justice Pro Tem., dissenting.
This Court is unconstitutionally constituted and an accused is denied due process of law by his or her case's being referred to it instead of the Louisiana Supreme Court as constituted by La.Const. Art. 5 §§ 1, 3 and 4, to which this Court should order this case referred.
See the writer's dissent, State v. Petterway, La.1981, 403 So.2d 1157, 1161.
NOTES
[1] Judges Redmann and Kliebert of the Court of Appeal, Fourth Circuit and Judge Cutrer of the Court of Appeal, Third Circuit, participated in this decision as associate justices ad hoc, joined by Justices Calogero, Dennis, Blanche and Lemmon.
[2] Seventeen assignments of error were briefed by defendant and combined into eight different arguments. Those arguments/assignments of error not covered in the main opinion are covered in an appendix to this opinion which, though unpublished, are to be included in the public records of this Court.
[3] In its opinion denying the original motion for a change of venue, the trial judge gave the following summary of the items submitted for review:

"This court was presented with various newspaper articles covering the period of October 21, 1978 through the morning of September 7, 1979, being the date of the alleged shooting of police officer Thompkins through and until the date for hearing on the motion for change of venue. This court examined all newspaper articles, heard and observed television film clips from KTBS, Channel 3, Shreveport, Louisiana for the days October 21, 22, 23, 24 and 27, 1978. The October 21, 1978 film clip consists of a factual description by the Chief of Police of Shreveport, Chief Lanigan, of a shooting incident in which a person identified as Harold W. Hersey shot and killed a Shreveport police officer. He cited a viewing of neighborhood scenes, in the area where the alleged shooting occurred, nothing of an unusual nature occurred with exception of Chief Lanigan's statement, `a man has killed a police officer, shot him in cold blood', and will be charged with a felony offense. The second film clip, dated October 22, 1978 is of the Commissioner of Public Safety of Shreveport, Louisiana, Terry Hayes recapping the factual incident surrounding the shooting of Officer Thompkins. An unrelated film clip involved a Yazoo, Mississippi police chief who disappeared while in the Shreveport, Louisiana area.
On October 23, 1978 the film clip shows a funeral service of Officer Thompkins, a narration that approximately 500 uniformed police officers attended from this immediate area, portions of the eulogy by various officials, mention of passing close to the hospital where the defendant, who was injured in a gun battle, was hospitalized. Second film clip of this date, October 23, depicts Felde's sister, the defendant, Florence Yvonne McDonald's arrest. The film clip contains an interview with Detective Nichols of the Shreveport Police Department concerning the facts of the case and a notation that Felde did not make a statement. The October 24 film clip again relates to the sister as having been arrested and being placed under $25,000 bond.
The last film clip, October 27, 1978, is basically an interview with the Chief of Police, Lanigan, wherein he mentioned charges against the defendant and her arrest.
The defense introduced radio newscasts from KEEL Radio, Shreveport, Louisiana. The facts outlined are essentially the same facts contained in the television reports. The officers related that they received a call of a drunk, that defendant, Felde, was apprehended and was about to be allowed to go home on his own in a cab when Officer Thompkins finally arrested him and was taking him to jail. The news report outlined the fact situation surrounding the shooting incident, of Felde's escape from the police officers, a description of the weapon used by officers, a shotgun, and the fact that Felde was apprehended with a revolver in his possession with a reloaded clip and the fact the gun was cocked. The second news story of the incident and an interview with the Commissioner of Public Safety, Terry Hayes who called this one of the greatest tragedies that ever happened.
The October 23 news tape of KEEL is a story of the funeral by a newswoman which outlined this being the first time since 1965 that an officer had lost his life in the line of duty. The tape contained background music of the funeral with the newsperson describing the proceeding as persons passed the coffin, the motorcade to the cemetery and the interment service."
[4] The trial court, however, refused to close these proceedings and the defendant complains that this proved highly prejudicial.
[5] It appears there is no constitutional right to a closed hearing. As stated in Singer v. United States, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965):

"The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right. For example, although a defendant can, under some circumstances, waive his constitutional right to a public trial, he had no absolute right to compel a private trial..."