CARAWAY, J.
hOn October 30, 2012, a unanimous jury found Christopher Brian Cope guilty of one count of first degree murder of a police officer in violation of La. R.S. 14:30. After the jury deadlocked on the sentencing portion of the proceedings, the court imposed a life sentence at hard labor without benefits. Cope appeals his conviction raising three trial errors. We affirm.

Facts

While on duty in the early morning hours of October 24, 2010, Shreveport Police Sergeant Timothy Prunty made a routine stop at a west Shreveport convenience store to check on the employees who worked the night shift. While there, he spoke with his friend and shift clerk, Carey Sonnier. At approximately 3:24 a.m., Sergeant Prunty and Sonnier stood outside the store talking. Sonnier leaned on a grey pole located in front of Sergeant Prunty’s vehicle, and Sergeant Prunty leaned on the hood of his car. Shortly thereafter, the two saw the approach of a red Camaro with very loud exhaust pipes. The driver pulled into the parking lot and stopped three spaces to the left (west) and slightly behind Sergeant Prunty’s car. Thinking she had a customer, Sonnier moved to go back into the store. As she did so, Sonnier heard several popping sounds, saw the flame from a gun and felt Sergeant Prunty shove her as he told her to run. Sonnier ran behind a dumpster and hid behind a fence. She saw the shooter spread his feet and hold the handgun with both hands for stability. Sonnier thought that the shooter was shooting at her as well as Sergeant Prunty. An eyewitness who |j>saw the events from an apartment across the street corroborated Sonnier’s information about the car and the shooter.
Sergeant Prunty returned fire, shattering the glass T-top of the vehicle. The evidence showed that the driver fired 14 rounds from a .40 caliber Smith and Wesson gun and Sergeant Prunty fired 11 times from his Glock .22 police-issued pistol.
From behind the fence Sonnier saw the driver pull away slowly and calmly. She ran back to the front of the building and saw a police car driven by Corporal Naomi Johnson approaching. Johnson was in the area when she heard gunshots and dispatched a shots-fired call. She traveled in the direction of the shots and noticed Son-nier flagging her down. Sonnier directed Johnson to Sergeant Prunty; she noticed blood around his leg area. Johnson made the call for help at approximately 3:33 a.m. From information given to her by Sonnier, Johnson was able to give a description of the driver and his vehicle as well as information that he was traveling west from the convenience store.
*156 In the meantime, Shreveport Police Officer Lacey Durham who was trained as an emergency medical technician, overheard Johnson’s call and traveled to the scene at approximately 3:37 a.m. She recognized Sergeant Prunty and attempted treatment. The Shreveport Fire Department arrived at the store at approximately 3:39 a.m. Lifesaving measures were attempted and Sergeant Prunty was transported to a local hospital where he later succumbed to his injuries. The autopsy indicated that he received five gunshot wounds to both legs and feet; the leg wounds were inflicted from behind. Sergeant Prunty’s cause of death was loss of blood, which resulted | ^largely from a laceration of the popliteal artery in his left upper leg; the bullet also fractured his distal femur and kneecap. A second wound to his upper left leg shattered his left femur and caused blood loss.
After the description of the vehicle and driver was broadcast, several Shreveport police patrol officers began looking for a red Camaro driven by a white, heavyset male with a goatee.[1] Shortly thereafter, several officers saw the vehicle and pursued the driver for eight to ten minutes before the vehicle stopped in a hotel parking lot. Glass particles fell from the Ca-maro’s T-top throughout the chase.
Upon stopping the vehicle at 3:51 a.m., the driver opened his car door, held up a handgun, ejected its magazine and a live cartridge and dropped the weapon onto the pavement before standing up from the car. Upon being ordered to drop to the ground, the driver slowly complied and police eventually handcuffed him. When the driver would not yield his right arm, officers utilized distraction strikes to his hands, back, rib and shoulders. The suspect was advised of his rights and placed in a patrol vehicle. He informed a Shreveport Police Detective that his name was Christopher Cope. Because Cope was actively bleeding from abrasions above the eye and on his cheek, he was provided treatment from the Shreveport Fire Department.
Cope was transported to the Shreveport Police Department, Violent Crimes Bureau, at approximately 5:00 a.m. He was kept separate from other witnesses and made comfortable. His transport officers stayed with him in 1¿the room for approximately 30 minutes to an hour, and Cope made no statements to them other than asking how “he” was.
Cope was interviewed at 7:00 a.m., after being read his rights a second time. In a statement, Cope admitted to being the shooter, but suggested that he wanted the police officer to kill him. Cope indicated that he drank six or seven beers earlier in the evening but was not drunk. He had watched fights at a friend’s house, hung out with a group of friends who had gathered on a local roadway, and visited a girlfriend. It was after he left the friend’s house that he shot at the security guard house of a local subdivision across town with his Smith and Wesson .40 caliber gun. He then stopped at the convenience store intending to get a beer. He claimed that he did not make enough money to support himself, was still living at home, and was in a “funk.” He stated that his mind “went blank” and he “done what [he] done.” He had “no reasonable explanation” for it other than his “stupidity.”
Sonnier was able to identify Cope as the shooter in a photographic lineup. On December 2, 2010, a grand jury indicted Cope for the first degree murder of Sergeant *157 Prunty.[2] Trial began on October 25, 2012. Cope was convicted as charged and sentenced to life imprisonment. He has appealed his conviction.

Discussion

Motion to Suppress

lRIn his first assignment of error Cope argues that the trial court erred in denying a motion to suppress his confession, which was the product of fear, duress and intimidation. On June 16, 2011, Cope asserted these grounds in a pretrial motion to suppress his confession, which was denied. On appeal, Cope contends that his vulnerability was compounded by threats and abuse he experienced during his arrest. Specifically, he argues that he was kicked and punched by officers as he was apprehended. He also contends that the officer (Allgrunn) who read him his rights called for violence against him and that the transporting officer (Hodges) had struck him during his arrest. Those actions allegedly would have caused “a reasonable person in Mr. Cope’s shoes to believe that he had to confess.” Cope also argues that his inability to obtain Shreveport Police Department regulations and guidelines dealing with distraction strikes or the identity of other officers who administered distraction strikes to him, prevented him from developing facts underlying the vol-untariness of the confession.
Before what purports to be a confession can be introduced into evidence, it must be affirmatively shown that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451; State v. Holmes, 06-2988 (La.12/2/08), 5 So.3d 42, cert, denied, 558 U.S. 932, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009). No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel a confession of crime. La. R.S. 15:452.
Louisiana Code of Criminal Procedure Article 703 provides, in part:
B. A defendant may move on any constitutional ground to suppress a | ^confession or statement of any nature made by the defendant.
[[Image here]]
D. On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant.
[[Image here]]
G. When a ruling on a motion to suppress a confession or statement is adverse to the defendant, the state shall be required, prior to presenting the confession or statement to the jury, to introduce evidence concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.
A ruling made adversely to the defendant prior to trial upon a motion to suppress a confession or statement does not prevent the defendant from introducing evidence during the trial concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.
*158 At a hearing on a motion to suppress a confession, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Collier, 39,650 (La.App.2d Cir.7/27/05), 909 So.2d 23, writ denied, 06-0308 (La.9/1/06), 936 So.2d 196; State v. Collier, 34,774 (La.App.2d Cir.6/20/01), 792 So.2d 793, writ denied, 01-2199 (La.6/7/02), 817 So.2d 1142.
The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his or her Miranda rights.[3] Holmes, supra; Callier, supra. When claims of police misconduct are raised, the State must specifically rebut the allegations. Holmes, supra.
In determining whether a ruling on a motion to suppress is correct, an |7appellate court is not limited to evidence adduced at the hearing on the motion, but also may consider pertinent evidence given at trial. State v. White, 39,681 (La.App.2d Cir.5/11/05), 903 So.2d 580; State v. Daniels, 614 So.2d 97 (La.App. 2d Cir.1993), writ denied, 619 So.2d 573 (La.1993). A trial judge’s ruling on whether a statement is voluntary is given great weight and will not be disturbed on appeal unless clearly unsupported by the evidence. State v. Vigne, 01-2940 (La.6/21/02), 820 So.2d 533.
Low intellect, moderate retardation or diminished mental capacity does not per se and invariably vitiate capacity to make a free and voluntary statement or a knowing and intelligent Miranda waiver. Holmes, supra; State v. Manning, 03-1982 (La.10/19/04), 885 So.2d 1044, cert, denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005); State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272. Any mental incapacity is an important factor to consider in deciding the voluntariness of a confession. State v. King, 41,084 (La.App.2d Cir.6/30/06), 935 So.2d 815, writ denied, 06-1803 (La.2/16/07), 949 So.2d 411. Voluntariness is determined on a case-by-case basis, under a totality of the circumstances standard. Manning, supra; King, supra.
The fact that an officer used force to subdue an arrestee is certainly an element which the judge should consider on the question of voluntariness. However, other evidence may convince a judge beyond a reasonable doubt that the statement was voluntary. State v. White, 329 So.2d 738 (La.1976). That the force used is neither excessive nor designed to compel a confession |sare factors appropriately considered in the determination of volun-tariness. Id.
At the hearing on the motion to suppress, the defense examined five of the Shreveport Police officers who secured Cope and placed him in custody. Each of these officers also testified at trial.
Officer Jason Allgrunn testified he was one of the six or seven officers who converged upon Cope when he exited his car. Allgrunn read Cope his rights at a distance of approximately six inches from his left ear as he was lying face down. Cope indicated he understood his rights by nodding. Cope softly told Allgrunn that he was not resisting arrest. Allgrunn did not smell alcohol on Cope’s breath.
Allgrunn stated that he never threatened Cope, did not promise anything to him or strike his person. He saw no other officer strike Cope and did not hear any *159 one threaten him or promise him anything. Allgrunn admitted that he made two statements, which can be heard on his mobile video system (“MVS”). Those included his comments that “I wish you would have pointed that at us,” and “Give this guy some love.”
Sergeant Wiley Lindsey testified that once Cope was on the ground, numerous officers assisted in taking him down. He indicated that “they were trying to place his hands behind his back, and he kept resisting, wouldn’t put both of them behind his back.” Lindsey testified that “distraction strikes” were used in an attempt to get Cope’s hands behind his back for handcuffing. He stated the strikes were performed with fist blows upon Cope’s arms, leg, thigh, and sides until he gave up his hands.
|flLindsey’s MVS was played, and he narrated it. He acknowledged hearing vulgarity on the tape at the time of Cope’s arrest, but did not know who made the statements. He stated that Cope did not respond in any way to the language. He stated that after Cope’s arrest, he was treated by the Shreveport Fire Department for abrasions on his face and arms. Lindsey described the abrasions as being from the pavement because Cope was face down.
Exhibit S-l included the MVS evidence from both Sergeant Lindsey’s and Officer Allgrunn’s vehicles. The exhibit also contained the MVS evidence from Corporals Tabor’s and Hodges’ vehicles, two officers who assisted in Cope’s arrest but did not testify at the hearing.
Notably Sergeant Tabor’s MVS was the only one to depict the details of Cope’s arrest. It showed that upon the officers’ verbal commands to Cope to lie on the ground, he slowly complied, lying face down on the pavement. Thereafter, 9 to 11 officers converged upon Cope. The video shows the securing officers having difficulty in handcuffing Cope’s right hand. In an effort to secure the hand, Officer Hodges administered one. or two strikes to his back, and one unnamed officer kicked him once near his upper body. Another officer administered several fist strikes near his shoulders. Within seconds thereafter, Cope’s hand is secured, and he is handcuffed at approximately 3:32 a.m.
All officers then removed themselves from Cope. He was turned on his back and searched. He was placed face down again where he remained until 4:11 a.m., when he was placed in Officer Hodges’ vehicle. In this interim period, officers are seen standing near Cope. Notably, one officer l^can been seen leaning over Cope and yelling at him. A second officer leaned down near Cope’s ear for a few seconds as if he were whispering to him, although nothing can be heard on the video.
A photograph of Cope was taken at the police station after his arrest. It shows minor abrasions around Cope’s right eye and cheek.
Lieutenant Jimmy Muller testified that in his position as the Detective Bureau Executive Officer, he assigned tasks for the detectives servicing the case. He instructed Officers Hodges and Minor, who transported Cope to the station, to maintain Cope as a suspect separate from any other witnesses. Cope was taken to the property crimes unit and placed in an empty office. Hodges sat with Cope in the room with Minor outside the door. Muller asked Cope if he wanted him to call his father. Cope declined the offer but stated that he was thirsty. He was provided water and allowed to take his handcuffs off while waiting to be interviewed. Restroom facilities were provided for Cope. Muller did not ask Cope anything or threaten or promise anything to him. *160 Cope appeared lucid to Muller. He stated that Cope did not appear to be intoxicated or under the influence of anything.
Sergeant Jody Jones testified that he was in charge of the day shift homicide unit and was on call the weekend of this event. Jones and Detective Lane Smith interviewed Cope, having waited until other witnesses had first been interviewed.
Cope was interviewed at 7:00 a.m. No pre-interview was conducted. In fact, Jones had no contact with Cope prior to the formal interview. An audio recording of the interview was placed in evidence. Jones testified that videotape recorders were never used in his division.
|nJones testified that Cope was read his rights a second time prior to giving a statement. Cope was not upset or emotional. Jones identified a copy of the waiver form signed by Cope. Jones recalled that Cope understood what was being shown to him. He did not appear to be intoxicated, was offered no inducement to sign the document, was not promised any benefit for giving a statement, and was not threatened in any way. Cope was not tested for intoxication. Cope signed the form and verbally acknowledged that he was willing to waive his rights.
Detective Lane Smith had actually spoken to Cope before he was taken to the station and had assigned Officer Hodges and Minor to protect Cope from any hostility of other officers. He confirmed Jones’s testimony concerning Cope’s condition during his statement.
Officer Chris Hodges, who testified at trial, was also present as Cope exited his car and was arrested. He issued commands to Cope to get out of the car. Cope complied. Hodges proceeded to Cope and attempted to handcuff him. He described Cope as “tense.” It was Hodges who “delivered a couple of strikes to his back to gain compliance” and was then able to get him handcuffed. Hodges recalled that it was Cope’s right arm that was not yielding, “up towards the front of his chest area.” He was concerned that Cope had a weapon. When questioned about the video of Cope’s arrest, Hodges admitted that other officers delivered strikes to get Cope into handcuffs.
Hodges explained that a distraction blow is a closed fist strike used to gain compliance, which can be done to the back or ribs in an effort to pull the arm out. Hodges did use his fists and inflicted the blows “in the | i2shoulder area of [Cope’s] back.” After Cope was handcuffed, Hodges rolled him over to his back and conducted a pat-down search for weapons. Hodges did not recall that Cope said anything.
Hodges also testified that at the station he never questioned Cope during the time that he guarded him. Cope never asked for food or for a lawyer or to speak to relatives or to friends. Hodges described Cope as being without emotion. He recalled that Cope asked how “he” was, referring to Sergeant Prunty. Hodges told Cope that he did not know, although he knew the officer was deceased.
Officer Jimmie Minor was called at trial by the defense. Minor first became involved "with Cope as he was taken into custody. He stayed with Cope on the scene and then followed Officer Hodges to the Shreveport Police Department. The room where Cope was guarded was fairly deserted and no other officers came into contact with him. Minor was instructed to stay with Cope until detectives arrived to interview him. He recalled that his time with Cope spanned nearly two hours. Minor was instructed to keep Cope comfortable. He testified that he was not abusive toward Cope, who was quiet and stared at the ground most of the time. Minor re *161 called that Cope asked him “several times” how the Sergeant was doing.
As a DWI enforcement officer, Minor saw nothing in Cope to cause him to request a breath test. Minor stated that Cope was able to walk to the bathroom on his own, did not request to speak to a lawyer or to his father or any family members or friends. He never used physical force against Cope or threaten him in any way. He and Officer Hodges never promised him anything. Minor recalled that Cope’s eyes were red and moist. Minor saw 11sCope cry on one occasion during his custody, but he never said he was sorry for what he did.
The record before us does not demonstrate error in the trial court’s determination that Cope’s statement was free and voluntary. Eight officers testified about the circumstances leading to Cope’s statement. His recorded statement reveals a coherent, cooperative defendant who responded appropriately to the interrogation. He answered all questions appropriately despite his claims of being “particularly vulnerable” as a 24-year-old dropout. His awareness of his situation is shown by his inquiries about the condition of Sergeant Prunty. It is undisputed that Cope was informed of his rights on two occasions, once immediately prior to his statement. His waiver of those rights was likewise clear, calm and logical. Significantly, Cope was afforded physical comfort in the two hours in which he waited to be interviewed. After the initial scuffle with the officers, his contact with police officers was limited to the two who guarded him and the two who interviewed him.
The record does not support Cope’s claim that the “threats” and “abuse” he received at the arrest scene and during transport defeated the state’s burden of proof. Although the video evidence of Cope’s arrest shows that officers struck Cope several times, it also corroborates the officers’ testimony that the strikes were used during their struggle to obtain Cope’s right hand. The distraction strikes, including the inappropriate kick by one officer, occurred for only seconds, were not excessive and accomplished | utheir purpose quickly.[4] The only noticeable physical injuries Cope received as the result of his arrest were minor abrasions to his face, for which he received immediate treatment.
Likewise, Hodges’ actions during arrest were legitimate methods of subduing Cope, and the video evidence of Cope’s transport reveals no evidence of actual or perceived coercion by Hodges. In fact, that evidence shows that neither Cope nor Hodges made any statements during travel. Ultimately, Hodges never interviewed Cope and answered only one question.
The statements made by officers at the arrest scene, while emotionally charged, were not shown to have been intended to obtain a confession. The video shows that Cope had limited close-up exposure to police at the arrest scene and the statements made to him were one-time events of short duration.
From this evidence it was not unreasonable for the trial court to conclude that statements made by the officers reflected their anger at Cope for shooting a fellow officer rather than coercive efforts to obtain a statement of guilt and that the force used by the officers was designed to subdue Cope and not to compel a confession. Ultimately, with Cope’s confession being given some two hours after any of these *162 events, we find no error in the trial court’s determination that statements made to Cope at his arrest did not render his statement involuntary. For these reasons, this assignment of error has no merit.
| mVenue
Cope next argues that the trial court erred in denying his motion for change of venue based upon the nature and extent of pretrial publicity. He asserts that such publicity affected the jury venire to the extent that Cope could not obtain a fair and impartial jury.
In pretrial proceedings, the State stipulated to its release to the media of video from one of the police vehicles documenting Cope’s arrest. Subsequently, Cope filed a Motion for Change of Venue arguing that the nature and extent of pretrial publicity, which was “encouraged by the direct involvement of the District Attorney’s Office,” was so pervasive as to deprive him of a fair and impartial jury. With the agreement of the defense, the Court deferred ruling on the motion until voir dire of potential jurors. After a jury of 12 was selected and during voir dire for alternates, after each had been examined and challenged on publicity, the defense re-urged its venue challenge.
The defense argued that Cope could not have a fair trial due to the percentage of jurors who indicated exposure to the case and the inflammatory publicity, including the details of the arrest and broadcast of Cope’s photograph. The court denied the defense’s motion pointing out that it had “painstakingly, individually questioned each and every prospective juror on this issue.”
La.C.Cr.P. art. 622 states:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending. In deciding whether to grant a change |ifiof venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
The right to an impartial jury and a fair trial is guaranteed to every defendant. See La. Const, art. I, § 16; State v. Magee, 11-0574 (La.9/28/12), 103 So.3d 285, cert, denied, — U.S.—, 134 S.Ct. 56, 187 L.Ed.2d 49 (2013); State v. Sparks, 88-0017 (La.5/11/11), 68 So.3d 435, cert. denied, — U.S.—, 132 S.Ct. 1794, 182 L.Ed.2d 621 (2012). To effect this guarantee, the law provides for a change of venue when a defendant establishes that he or she will be unable to obtain an impartial jury or a fair trial at the place of original venue. Id.
It is only in exceptional circumstances, such as the presence of a trial atmosphere that is utterly corrupted by press coverage or that is entirely lacking in solemnity and sobriety, that prejudice against a defendant may be presumed. Magee, supra. Otherwise, it is the defendant’s burden to demonstrate actual prejudice. Id.
To meet this burden, a defendant must prove more than mere public general knowledge or familiarity with the facts of the case. He must demonstrate the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case. Magee, supra; State v. Clark, 02-1463 (La.6/27/03), 851 So.2d 1055; cert, denied, 540 U.S. 1190, 124 S.Ct. 1433, 158 L.Ed.2d 98 (2004); State v. Frank, 99-0553 (La.1/17/01), 803 So.2d 1. A defendant is not entitled to a *163 jury entirely ignorant of his case and cannot prevail on a motion for change of venue simply by showing a general level of public awareness about the crime; rather, he must |17show that there exists such prejudice in the collective mind of the community that a fair trial is impossible. Ma-gee, swpra; Clark, swpra. Whether a defendant has made the requisite showing of actual prejudice is a question addressed to the district court’s sound discretion, which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion. Magee, supra; Sparks, supra.
In State v. Bell, 315 So.2d 307 (La.1975), the Louisiana Supreme Court enumerated several factors to be considered in the change of venue determination. These factors include: (1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community, which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire.
In determining whether to change venue, the focus must extend beyond the prejudices and attitudes of individual venire persons. The defendant must be allowed to show that, even if it would be possible to select a jury whose members were not subject to a challenge for cause, prejudice or influences exist within the community at large that would affect the jurors’ answers during voir dire or the witnesses’ testimony, or that for any other reason, a fair and impartial trial could not be obtained in that venue. Ma-gee, supra; Clark, supra; Bell, supra. The district court’s |18ultimate determination must rest on the community’s attitude toward the defendant. Magee, supra; Clark, supra.
In reviewing a denial of change in venue, the primary task of the court is to inquire as to the nature and scope of publicity to which prospective jurors in a community have been exposed and examine the lengths to which a court must go to impanel a jury that appears to be impartial in order to ascertain whether prejudice existed in the minds of the public, which prevented the defendant from receiving a fair trial. Magee, supra; Clark, supra.
In performing this review, courts must distinguish largely factual publicity from that which is invidious or inflammatory, as the two present real differences in the potential for prejudice. Id. While ultimately there is no bright line test for ascertaining the degree of prejudice existing in the collective mind of the community, the seven Bell factors help facilitate the inquiry. Magee, supra. In addition, courts have examined the number of jurors excused for cause for having a fixed opinion as another gauge of whether prejudice exists in the public mind. Id.
Before consideration of the responses of potential jurors in the actual voir dire examination in this case, Cope argues that the Caddo Parish jury pool was tainted by news reports showing an MVS video of his arrest and his arrest photograph that were given to a local television station by the District Attorney’s office. He contends that the death of Prunty was “well known” in the community and “left little doubt” in the minds of the public about Cope’s guilt.
| ^Nevertheless, Cope made no showing regarding when or if the MVS video was *164 run on the news by a station. No tapes of local newscasts were placed in evidence. No print or electronic media accounts were offered. In sum, no substantial body of pretrial publicity was shown to the court, particularly, no direct evidence of the prejudicial or inflammatory nature of the media information.
This lack of excessive and inflammatory publicity contrasts to other cases in the jurisprudence examining the issue of venue change. See, for example, Magee, supra, which included extensive evidence of media coverage including 200 pages of newspaper articles, online comments from the public, transcripts of television coverage of the crime and multiple DVDs containing recordings from major local media outlets; State v. Lee, 05-2098 (La.1/16/08), 976 So.2d 109, cert, denied, 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008), in which the defense introduced “thousands of print and media stories” about the case; Manning, supra, where 14 newspaper articles were submitted concerning the crime; and Clark, supra, in which numerous newspaper articles relating to the case and a number of transcripts from a local television station were introduced.
Further, we have reviewed the information obtained by the actual examination of prospective jurors. The trial court interviewed 190 potential jurors. Of those 190, 156(82%) indicated that they had some exposure (most with vague factual recollections of the events) to the case; 34(18%) individuals knew nothing about the case. The court individually interviewed the 156 potential jurors.
12()Of the 156 jurors with knowledge of the death of the officer, 36(19%) were removed for preconceived opinions of the defendant’s guilt. The defense challenged two additional jurors for such pretrial opinions of guilt, which were denied by the court. An additional 18 potential jurors were challenged for cause due to impartiality because of relationships to or with law enforcement (8),- Prunty (5) or Cope (5). Ultimately, of the 15 jurors and alternates chosen, 7(47%) had no knowledge of the case. The remaining 8 jurors who served on the case with some knowledge of the murder assured the court that they would be able to decide the case solely on the evidence; one of those was an alternate juror.
Importantly, of the 82% of potential jurors who knew about the case, only a few expressed more than a vague knowledge about the facts, which they had gleaned from the news or from conversations. None mentioned seeing a video on the news. Only two recalled seeing Cope’s photograph. These facts fail to demonstrate any deep-seated pattern of prejudice against the defendant. Rather, all that was shown is a general level of public awareness about the crime. When compared with other cases in which the Supreme Court has found no abuse of discretion in the denial of a venue change, this percentage falls within the range of acceptable general public awareness. See for example, Magee, supra, in which 43% of prospective jurors noted their familiarity with the facts of a case; Lee, supra, in which 98.4% wére vaguely familiar with the . case through media or conversations; Clark, supra, in which 62.9% claimed some exposure to the case; Frank, supra, where 97% of the venire had been exposed to some publicity; State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, cert, denied, 531 U.S |2 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000), in which 80% of the prospective jurors had awareness of the case before trial; State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810, in which 86.33% of potential jurors possessed a vague recollection of the facts.
*165 Likewise, the 19% of jurors with fixed opinions is inadequate to demonstrate reversible prejudice in the public mind. All of the prospective jurors who expressed a pretrial opinion of Cope’s guilt based upon pretrial information of the crime were released for cause. Moreover, such percentage also falls within ranges sanctioned by the courts as acceptable. See, Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), in which 26% with pretrial guilt opinions held not to show prejudice; Sparks, supra, where 12.5% fixed opinion was insufficient to demonstrate prejudice; Lee, supra, in which 32% of potential jurors excused for exposure to case or fixed opinions found insufficient to show public prejudice; Frank, supra, in which 15% of jurors excused due to an inability to put aside preconceived disposition or outside information found insufficient to show prejudice. Compare Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), in which 62% excused for fixed opinion indicated that impartial jurors were hard to find.
After applying the first Bell factor to these facts, we cannot say that the defense has shown that the events in question fostered such emotionally charged media coverage as to prejudice Cope’s right to a fair trial.
Additionally, we do not find persuasive Cope’s arguments regarding the second Bell factor, the connection of government officials with publicity. _j2gA review of the jurisprudence shows that this factor relates to statements made by government officials connected to the case which are harmful or inflammatory and incite prejudice in the minds of the public.
In this case, the District Attorney’s office stipulated that it had released the subject video to a local television station. However, on the hearing for change of venue, the defense presented no evidence that any government official involved in the matter, including any individual from the District Attorney’s office, made any comments or offered any opinion about the case to the media. Thus, Cope’s argument that the actions of the District Attorney’s office created community-wide prejudice against him such that he could not receive a fair trial is not supported by the evidence. Compare Magee, supra, where comments by both the district attorney and sheriff regarding the gruesomeness of the crime were reviewed.
The remaining five Bell factors also afford Cope no relief and are not seriously raised in argument. The trial in this matter occurred about two years after the crime. While the murder of a police officer would necessarily receive media attention, the defense has not shown that the case received more notoriety than any other capital murder case. Cope has also failed to demonstrate that the area from which the jury was drawn showed overriding prejudice in the community that prevented him from receiving a fair trial. According to the 2010 Census, Caddo Parish has a population of 254,969 people. From this large number of individuals, a qualified and fair jury was possible.
Given the broad discretion granted to trial courts in these matters, we cannot say that Cope has established an abuse of discretion in the denial of [ ¾⅜⅛ request for change of venue. Overall, he has failed to demonstrate that prejudice against him existed in the collective mind of the community such that a fair trial was not possible. For these reasons, this assignment of error lacks merit.

Survivability Defense

In his final assignment of error, Cope argues that the trial court violated his constitutional rights to confrontation and cross-examination of witnesses, thereby prohibiting his presentation of a survivabil *166 ity defense. Specifically, Cope complains that the State “at least twice” curtailed his right to confront and cross-examine witnesses, including the coroner and Officer Hodges. He contends that the court limited his cross-examination of the coroner first when he was prevented from questioning the coroner on the issue of survivability, and second when the court denied his request to introduce into evidence the City of Shreveport’s medical training manual, First Responder, Your First Response in Emergency Care (“First Responder Manual”), finding that survivability was not a relevant issue.
Testimony showed that Officer Lacey Durham, the first responder at the shooting, found Sergeant Prunty with fixed, dilated eyes and an agonal respiration, which she recognized as a death breath. She knew from these symptoms that his heart had stopped. She never saw any signs of life from him and believed' that he was dead. Durham testified that she knew that she “needed to control a bleed,” so she began looking for wounds.
She saw what her training showed her to be an entrance wound near the “right upper side” of his thigh near the femoral artery, so she “started there.” She focused on this wound, which she knew to be serious, and she | ¡^believed that it was this wound producing the blood. She explained that the femoral artery is the second largest artery in the body and if punctured can cause a person to “bleed out pretty fast.” Durham knew that she needed to “squeeze” the artery off to hold the bleed. She understood that a tourniquet would not be practical. She exposed the wound and “realized how much blood loss there was,” although she never saw blood actively coming out of the wound. She then checked the rear of Prunty’s thigh, hoping that the back wound would be larger than the front and that she might “find a pulsation there to squeeze off.” She searched for “something that [she] could hold” until the fire department got there to administer fluids.
Paramedics responding to the scene testified that they saw no signs of life in Sergeant Prunty.
The Caddo Parish Coroner, Dr. Todd Thoma, testified at trial and was qualified as an expert in medicine, emergency room medicine, and cause of death determinations. He testified that he also works as an emergency room physician and was the only attending physician on duty when Sergeant Prunty was brought in. Dr. Thoma testified that when Prunty presented, he was completely unresponsive and had an airway in his trachea. Dr. Thoma stated that it was necessary to open Sergeant Prunty’s chest where it was determined that he had completely exsanguinat-ed; his heart was empty. To no avail, heroic measures were pei'formed on Prunty, and he was pronounced dead by Dr. Thoma.
Dr. Thoma was present for part of Sergeant Prunty’s autopsy performed by Dr. Long Jin later that morning. It was then that the physicians discovered that the wounds to Prunty’s legs were inflicted from Ipjjthe back. Dr. Thoma initially believed that Sergeant Prunty suffered from an injury to the femoral artery that caused massive blood loss.
Ultimately, however, Dr. Thoma concluded that it was the injury to Sergeant Prunty’s lower left leg that caused the bleeding. He testified that the bullet hit the distal femur, shattered his kneecap, and in the process severed the popliteal artery, an extension of the superficial femoral artery. He described the injury as a “significant vascular injury” because the popliteal artery feeds the lower extremity. Dr. Thoma explained that Sergeant Prunty bled to death, ultimately from a combina *167 tion of all of the wounds, but primarily from the severed popliteal artery.
The state questioned Dr. Thoma on the issue of survivability of the wounds that Sergeant Prunty received. He testified that with these wounds, time is of the essence and that if “he were shot in an emergency department or in an operating room, possibly that could have been survivable.” He further explained that “if it happens outside of a medical facility, chances are it’s lethal.” Dr. Thoma also stated that even if a vascular surgeon had been outside of the' convenience store, “without the proper equipment, he probably wouldn’t have been able to stop the bleeding.”
On cross-examination by the defense, Dr. Thoma could not say how long it takes for an individual to bleed out from the severed artery. He agreed that the paramedics indicated that Sergeant Prunty was near death when they arrived at the scene some five minutes after the shooting. Dr. Thoma explained that compression (squeezing the artery in an attempt to stop bleeding) is used to stop an injury like this one. He explained that tourniquets are not used much. He testified that had compression been | ^applied to Sergeant Prunty’s popliteal artery, “when it first starting happening,” compression “would have helped at that point in time.” Dr. Thoma reiterated that if compressioi) had been applied before extremis, “it might have helped.”
It was at this point in Dr. Thoma’s testimony that the State lodged an objection to the relevancy of this line of questioning because the defense had conceded the cause of death in opening statements. Further, the state argued that the issue of whether the victim could have been saved was irrelevant to the defendant’s culpability for murder.
Defense counsel argued that the evidence was relevant to the jury’s determination of specific intent to kill or inflict great bodily harm. The trial court sustained the state’s objection.
Dr. Long Jin also testified as an expert in forensic pathology. On cross-examination by the defense, Dr. Jin agreed that compression on the popliteal artery would have been a recommended-course of treatment to stop bleeding.
Officer Hodges later testified. On cross-examination, he was asked whether he had received first responder training at the police academy. He indicated that he had indeed received training in CPR. The witness was then shown a copy of the First Responder Manual. After reviewing the book, Hodges testified that it appeared to be a copy of the materials used by the Shreveport Police Academy that he attended. Hodges was asked no questions about the manual’s content.
Upon completion of the witness’s testimony, the defense attempted to introduce the manual into evidence upon objection to its relevancy. The [^defense argued that the book contained information indicating techniques that could have been used to save Sergeant Prunty’s life and that it was therefore relevant to the issue of survivability. Defense counsel pointed to specific areas of the book dealing with examining the patient from head to toe, blood loss and control of external bleeding. The trial court sustained the state’s objection on the grounds that the prejudicial nature of the manual outweighed its probative value, considering that evidence had been elicited from witnesses regarding the measures actually taken by first responders. The defense proffered the First Responder Manual for purposes of appeal.
On October 27, 2012, during trial, the state filed an oral motion in limine, seeking to exclude the expert testimony of Dr. *168 James Lauridson, expert in internal medicine and anatomic and forensic pathology, on the grounds that his expert testimony would relate to the issue of survivability. Again the defense argued that the issue of survivability was relevant to proof of specific intent to kill or inflict great bodily harm. The defense argued that Dr. Lau-ridson’s testimony would be that if a first responder would have administered compression behind the knee to Sergeant Prunty’s popliteal artery, within the first five minutes after the shooting, then the outcome of the case may have changed. The court deferred ruling on the motion pending defense counsel’s research of the issue but sustained the state’s objection two days later.
The defense sought writs on the issue from this court, which reversed the ruling, specifically finding that while the expert may not testify directly as to specific intent, “he may testify as to the survivability of the victim’s wounds.” (Writ No. 47,985-KW, October 29, 2012).
1 ^Thereafter, Dr. Lauridson was allowed to testify. Dr. Lauridson stated that Sergeant Prunty’s popliteal injury would have caused the most blood loss. He explained that the simplest and most effective treatment for this condition is pressure or compression applied to the would to close the vessel. In this case, compression would be applied to the back surface of the left knee. Dr. Lauridson believed that if pressure had been applied between five and eight minutes after the injury, Sergeant Prunty would not have developed severe hemorrhagic shock that led to his death. He stated that compression applied within this time frame “would have greatly increased” the officer’s survivability. No special tools were necessary to apply the pressure.
Dr. Lauridson admitted that pooling of blood in the groin area might have led medical personnel to think that the upper thigh wound, rather than the wound to the knee, was the wound that had lacerated an artery and caused the blood loss.
The defense’s final witness was Officer Jimmie Minor. During his testimony, the defense questioned the officer about his training with the Shreveport Police Academy. He did not recall that he was supplied with a textbook on first responder practices. The state objected to the attempt to introduce the First Responder Manual into evidence again. However, in light of this court’s ruling, the trial court allowed the officer to be questioned about his training. When shown the First Responder Manual, Minor generally recognized the name and contents of the book. He agreed that a copy of the book would have been provided to him for study while at the Shreveport Police Academy. Without any further questioning of the |2awitness about the book, the First Responder Manual was introduced into evidence. Ultimately, however, upon objection, the court did not allow the 449-page book to be published to the jury after concluding that no witness had been questioned with reference to any specific provision.[5] Because the manual was admitted into evidence, however, the court allowed the defense to refer to four paragraphs during closing arguments.
The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecu *169 tion “to be confronted with the witnesses against him.” This right is secured for defendants in state as well as federal criminal proceedings. State v. Robinson, 01-0273 (La.5/17/02), 817 So.2d 1131. The confrontation clause of our state constitution specifically and expressly guarantees each accused this right as well. See La. Const, art. 1, § 16; Robinson, supra.
Confrontation means more than being allowed to confront the witnesses physically. The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Cross-examination is the principal means by which believability and truthfulness of testimony are tested. Robinson, supra.
Confrontation errors are subject to a harmless error analysis. See Delaware v. Van Arsdall, 475 U.S. 673,106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); Robinson, supra; State v. Wille, 559 So.2d 1321 (La.1990). The | sncorrect inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness’s testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case.
Likewise, a criminal defendant has the constitutional right to present a defense. U.S. Const, amend. VI; La. Const, art. I, § 16; Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920,18 L.Ed.2d 1019 (1967); State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198. This right is also subject to a harmless error analysis. Van Winkle, supra.
We find no merit to Cope’s arguments. After this court’s ruling, Cope was allowed to present unlimited evidence relating to the issue of survivability. He chose to present his defense through the testimony of Dr. Lauridson, who stated that the use of compression at the appropriate time may have changed Sergeant Prunty’s outcome. Even so, the record shows that both Drs. Thoma and Jin offered the same testimony during the state’s case. In fact the defense elicited some of the testimony from both witnesses during cross-examination. Thus, Dr. Lau-ridson’s opinion merely cumulated testimony already received by the jury. Moreover, the defense was free to recall Dr. Thoma for further questioning on the issue of survivability but |S1 chose not to do so. Considering these circumstances, we find that Cope was not denied a defense and has demonstrated no prejudice in the court’s earlier limitation of Dr. Thoma’s questioning.
Likewise, the defense was ultimately allowed to introduce the First Responder Manual into evidence. It was incumbent upon the defense to question witnesses about the book’s contents or show why specific portions of the document were relevant to the case. During Hodges’ cross-examination, he was only asked about his knowledge of the publication. When he stated only a general familiarity with the contents of the book, he was asked no further questions by the defense. Upon the defense’s introduction of the manual into evidence, Hodges was not recalled for cross-examination.
*170 Extensive evidence relating to the actions of the first responders, appropriate treatment and patient assessment was presented to the jury through medical testimony. The relevant portions of the manual alluded to by defense counsel in argument would have been nothing more than cumulative evidence. Thus, Cope has suffered no prejudice in the events relating to the First Responder Manual.

Conclusion

For the foregoing reasons, Cope’s assignments of error are without merit. His conviction and sentence are affirmed.
AFFIRMED.

. Notably the car matched the description of a vehicle from which a shot had been fired at a subdivision security guard about an hour earlier in another part of town.

. Cope was also charged with the attempted first degree murder of Sonnier and the attempted first degree murder of the security guard at the second crime location. The state severed these counts from the Sergeant Prunty first degree murder proceedings.

. The rights are set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Because the officers testified regarding the Shreveport police department use of distraction strikes during arrest, Cope has shown no prejudice in the denial of his request to review Shreveport Police Department regulations and guidelines relating to their use.

. The court noted that although no witness had been questioned about specific provisions, defense counsel had placed four note markers in the manual. One referred to documentation, one referred to a first responder's initial reaction to and assessment of the scene and patient, and the third addressed three causes of shock including bleeding and the use of compression. The final note referenced entry and exit wounds.